ACCEPTED
03-14-00709-CV
3761772
THIRD COURT OF APPEALS
AUSTIN, TEXAS
1/14/2015 10:35:02 AM
JEFFREY D. KYLE
CLERK

**No. 03-14-00709-CV**

IN THE
THIRD COURT OF APPEALS
AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/14/2015 10:35:02 AM
JEFFREY D. KYLE
Clerk

ENTERGY TEXAS, INC.,

Appellant,

v.

PUBLIC UTILITY COMMISSION OF TEXAS,

Appellee.

*Appeal from the 53rd Judicial District Court, Travis County, Texas*
*The Honorable Amy Clark Meachum, Judge Presiding*

_____

**APPELLANT'S BRIEF**

_____

John F. Williams
State Bar No. 21554100
jwilliams@dwmrlaw.com
Marnie A. McCormick
State Bar No. 00794264
mmccormick@dwmrlaw.com
DUGGINS WREN MANN & ROMERO, LLP
600 Congress Ave., Ste. 1900 (78701)
P. O. Box 1149
Austin, Texas 78767-1149
(512) 744-9300
(512) 744-9399 *fax*

ATTORNEYS FOR APPELLANT
ENTERGY TEXAS, INC.

**ORAL ARGUMENT REQUESTED**

January 2015

# IDENTITY OF PARTIES AND COUNSEL

Pursuant to Texas Rule of Appellate Procedure 38.1(a), the following is a list of all parties to the order appealed from and the names and addresses of all trial and appellate counsel:

| Parties: | Attorneys: |
|---|---|
| Entergy Texas, Inc.<br>*Appellant* | David C. Duggins<br>John F. Williams<br>Marnie A. McCormick<br>Duggins Wren Mann & Romero, LLP<br>600 Congress Ave., Ste. 1900 (78701)<br>P. O. Box 1149<br>Austin, Texas 78767-1149<br>*Counsel in District Court* |
| | John F. Williams<br>Marnie A. McCormick<br>Duggins Wren Mann & Romero, LLP<br>600 Congress Ave., Ste. 1900 (78701)<br>P. O. Box 1149<br>Austin, Texas 78767-1149<br>*Counsel on Appeal* |
| Public Utility Commission of Texas<br>*Appellee* | Elizabeth R. B. Sterling<br>Megan M. Neal<br>Environmental Protection Division<br>Office of the Attorney General<br>P.O. Box 12548<br>Austin, Texas 78711-2548<br>*Counsel in District Court* |

| | |
|---|---|
| Texas Industrial Energy Consumers<br>*Intervenor* | Rex VanMiddlesworth<br>Benjamin Hallmark<br>Thompson & Knight LLP<br>98 San Jacinto Blvd., Ste. 1900<br>Austin TX  78701<br>*Counsel in District Court*<br><br>Meghan Griffiths<br>Andrews Kurth LLP<br>111 Congress Ave., Ste. 1700<br>Austin TX  78701<br>*Counsel in District Court* |
| Office of Public Utility Counsel<br>*Intervenor* | Sara J. Ferris<br>Office of Public Utility Counsel<br>1701 N. Congress Ave., Ste. 9-180<br>P. O. Box 12397<br>Austin, Texas 78711-2397<br>*Counsel in District Court* |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ........................................................... i

TABLE OF CONTENTS ................................................................................ iii

INDEX OF AUTHORITIES ..............................................................................v

STATEMENT OF THE CASE ....................................................................... viii

STATEMENT REGARDING ORAL ARGUMENT ........................................... viii

ISSUES PRESENTED.................................................................................. ix

NOTE REGARDING ADMINISTRATIVE RECORD.......................................... ix

STATEMENT OF FACTS ..............................................................................1

I.      ETI is an electric utility that is subject to traditional rate regulation by the Public Utility Commission of Texas. .........................................................1

II.     Under traditional ratemaking principles, a utility is entitled to a reasonable opportunity to recover all of its reasonable and necessary expenses and to earn a return on its investment. ...........................................2

III.    The Texas legislature has required ETI to participate in a new program that creates new costs and guarantees ETI a way to recover them outside the traditional ratemaking framework........................................5

IV.     The Commission has refused to permit ETI to recover all of the costs that result from the implementation of the new program..............................7

SUMMARY OF THE ARGUMENT .................................................................12

ARGUMENT ............................................................................................14

I.      The Commission erred in determining that "unrecovered costs," as contemplated by PURA section 39.452(b), include only the costs necessary to implement and administer the CGS program, and do not include "lost revenues, embedded generation costs, or any other types of costs." ............................................................................................14

        A.      The Commission's decision is inconsistent with the plain language of PURA section 39.452(b). ...............................................14

B.  The Commission's decision also contradicts the framework for cost recovery established in PURA section 39.452(b)..........................17

C.  This Court's decision in *CenterPoint Energy Houston Electric, LLC v. Public Util. Comm'n of Tex.* does not support the Commission's decision. ....................................................................20

    1.  This Court in *CenterPoint Energy Houston Electric* construed a different statute that had different language and a different purpose...............................................21

    2.  The Court's reasoning in the *CenterPoint Energy Houston Electric* case does not support the Commission's decision here. .......................................................23

        a.  This Court did not distinguish "costs" and "revenues" for all purposes...............................23

        b.  Regardless, ETI indisputably sought "costs" here. ........24

D.  The Commission's decision runs afoul of the principle espoused in *High Plains* and its progeny. ...........................................27

E.  The *quantity* of production costs eligible for recovery is not at issue here -- the Commission never reached that issue.......................28

II.  The Commission erred in determining that ETI may not recover CGS implementation costs prior to the date that the CGSC rider is approved......................................................................................................30

III.  The Commission erred in deciding not to authorize the recovery of interest on CGS implementation costs. ........................................................34

PRAYER.............................................................................................................36

CERTIFICATE OF COMPLIANCE....................................................................37

CERTIFICATE OF SERVICE .............................................................................38

APPENDICES ......................................................................................................39

# INDEX OF AUTHORITIES

## Cases

*Bluefield Waterworks & Improvement Co. v. Public Serv. Comm'n of State of W.Va.*,
262 U.S. 679 (1923) ........................................................................................3

*CenterPoint Energy Houston Electric, LLC v. Public Util. Comm'n of Tex.*,
354 S.W.3d 899 (Tex. App. – Austin 2011, no pet.) ................................... *passim*

*CenterPoint Energy Houston Electric, LLC v. Public Util. Comm'n of Tex.*,
408 S.W.3d 910 (Tex. App. – Austin 2013, pet. denied) .............................. 32, 33

*CenterPoint Energy, Inc. v. Public Util. Comm'n of Tex.*,
143 S.W.3d 81 (Tex. 2004) ......................................................... *passim*

*City of Dallas v. Railroad Comm'n of Tex.*,
No. 03-06-00580-CV, 2008 WL 4823225 *1 (Tex. App. – Austin Nov. 6, 2008, no pet.) ..........................................................................................4

*City of El Paso v. Public Util. Comm'n of Tex.*,
344 S.W.3d 609 (Tex. App. – Austin 2011, no pet.) .............................................3

*City of El Paso v. Public Util. Comm'n of Tex.*,
883 S.W.2d 179 (Tex. 1994) .......................................................................3, 4

*Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*,
271 S.W.3d 238 (Tex. 2008) .......................................................................16

*Federal Power Comm'n v. Hope Natural Gas Co.*,
320 U.S. 591 (1944) ....................................................................................2

*In re Entergy Corp.*,
142 S.W.3d 316 (Tex. 2004) (orig. proceeding) ..................................................2

*Office of Public Util. Counsel v. Public Util. Comm'n of Tex.*,
104 S.W.3d 225 (Tex. App. – Austin 2003, no pet.) .............................................1

*Ojo v. Farmers Group, Inc.*,
356 S.W.3d 421 (Tex. 2011) .......................................................................17

*Oncor Elec. Delivery Co. LLC v. Public Util. Comm'n of Tex.,*
  406 S.W.3d 253 (Tex. App. – Austin 2013, no pet.) ...........................3, 4

*Railroad Comm'n of Tex. v. High Plains Natural Gas Co.,*
  628 S.W.2d 753 (Tex. 1981) ................................................. 3, 27, 28

*Railroad Comm'n of Tex. v. Citizens for a Safe Future & Clean Water*,
  336 S.W.3d 619 (Tex. 2011) ...............................................................17

*State v. Shumake,*
  199 S.W.3d 279 (Tex. 2006) ...............................................................16

*Suburban Util. Corp. v. Public Util. Comm'n of Tex.,*
  652 S.W.2d 358 (Tex. 1983) ...............................................................3, 4

*Texas Alarm & Signal Ass'n v. Public Util. Comm'n of Tex.,*
  603 S.W.2d 766 (Tex. 1980) ..................................................................5

*Texas Coast Utils. Coalition v. Railroad Comm'n of Tex.,*
  423 S.W.3d 355 (Tex. 2014) ............................................. 3, 16, 20, 28

**Statutes**

Tex. Util. Code Ann. §§ 11.001, *et seq.* ........................................... vii, 1

Tex. Util. Code Ann. Ch. 36 ......................................................................2

Tex. Util. Code Ann. § 36.007.......................................................... 5, 18

Tex. Util. Code Ann. § 36.051........................................... viii, 2, 15, 28

Tex. Util. Code Ann. §§ 39.001-.359 .......................................................2

Tex. Util. Code Ann. § 39.252.................................................................35

Tex. Util. Code Ann. § 39.452................................................... *passim*

Tex. Util. Code Ann. § 39.905........................................... 20, 21, 22, 29

**Other Authorities**

Act of May 30, 2005, 79th Leg., R.S., ch. 1072 (HB 1567), § 1 (amended
  2006 & 2009)...........................................................................................5

**Rules**

16 Tex. Admin. Code § 25.231 ........................................................................... 4, 15

16 Tex. Admin. Code § 25.234 .............................................................................5

## STATEMENT OF THE CASE

This is a suit for judicial review of the final order of the Public Utility Commission of Texas in its Docket Number 38951, a proceeding initiated by Entergy Texas, Inc. for approval of tariffs implementing a competitive generation service program. Entergy Texas, Inc. sought judicial review of the agency's order primarily on the grounds that it violated the Public Utility Regulatory Act[1] and the Texas Supreme Court's decision in *CenterPoint Energy, Inc. v. Public Util. Comm'n of Tex.*, 143 S.W.3d 81, 84 (Tex. 2004).[2] The district court, Judge Amy Clark Meachum presiding, summarily affirmed the order.[3]

## STATEMENT REGARDING ORAL ARGUMENT

Cases involving public utility regulation are usually complex, and this one is no exception. For that reason, the Court's decisional process would be aided by oral argument.

---

[1] *See* Tex. Util. Code §§ 11.001, *et seq.*
[2] Clerk's Record ("CR") 4-19.
[3] CR 523-26.

## ISSUES PRESENTED

1.  Did the Public Utility Commission of Texas misconstrue Public Utility Regulatory Act section 39.452 by defining "any costs unrecovered as a result of the implementation of" a competitive generation service program to exclude base rate costs that Entergy Texas, Inc. may not recover as a result of implementation of the program?

2.  Did the Public Utility Commission misconstrue the same statutory provision by refusing to enable Entergy Texas, Inc. to accrue and recover the cost of developing the program at the legislature's direction?

3.  Did the Public Utility Commission violate Public Utility Regulatory Act section 36.051 and the Texas Supreme Court's decision in *CenterPoint Energy, Inc. v. Public Util. Comm'n of Texas*, 143 S.W.3d 81, 84 (Tex. 2004) by refusing to authorize Entergy Texas, Inc. to recover interest on its unrecovered costs of implementing the CGS program?

## NOTE REGARDING ADMINISTRATIVE RECORD

The Administrative Record in this case is comprised of Joint Exhibits 1, 2, and 3 to the Reporter's Record. The record consists of documents filed in two Commission dockets.

- Joint Exhibit 1 is the Administrative Record ("AR") first filed with the district court, and consists of non-confidential filings in Public Utility Commission Docket No. 38951.

- Joint Exhibit 2 is a Supplemental Administrative Record ("Supp. AR") filed with the district court, and consists of non-confidential filings in Public Utility Commission Docket No. 37744.

- Joint Exhibit 3 is a Supplemental Administrative Record filed with the district court and consists of documents that were filed confidentially in Docket Nos. 37744 and 38951. These were sealed by the district court. None of these documents are cited in this brief.

## STATEMENT OF FACTS

This case concerns the Public Utility Commission's construction of a statute that creates an exception to several regulatory principles traditionally applied to electric utilities in Texas.

## I.  ETI is an electric utility that is subject to traditional rate regulation by the Public Utility Commission of Texas.

Entergy Texas, Inc. ("ETI" or "the Company") is an investor-owned electric utility.  ETI provides electric services to over 420,000 retail customers, primarily in southeastern Texas.[4]

Historically, Texas electric utilities have been involved in all aspects of the provision of electric service, from beginning to end.  That is, electric utilities have been responsible for either producing or purchasing power and delivering it over transmission and distribution networks to end users. *See, e.g., Office of Public Util. Counsel v. Public Util. Comm'n of Tex.*, 104 S.W.3d 225, 227 (Tex. App. – Austin 2003, no pet.).  Each electric utility has been responsible for providing power to all requesting customers in a defined "service area."  *Id.* at 227-28.  These services, and the rates charged for them, have been subject to regulation by Public Utility Commission of Texas (the "Commission" or "PUCT") under the Public Utility Regulatory Act ("PURA").[5]

---

[4] Supp. AR Binder 3 (Docket No. 37744, ETI Exh. 4, Domino Direct at 1).
[5] *See* Tex. Util. Code §§ 11.001, *et seq.*

1

The Texas legislature in 1999 ordered electric utilities to "unbundle" their generation, transmission, distribution, and customer service functions as part of an effort to introduce competition into the Texas retail electric industry. *See* Tex. Util. Code Ann. §§ 39.001-.359. However, in the course of implementing the legislature's mandate, uncertainty developed about whether several areas of the state, including ETI's service territory, were ready for the successful transition to retail competition. *See In re Entergy Corp.*, 142 S.W.3d 316, 320 (Tex. 2004) (orig. proceeding). In 2009, the legislature amended PURA to require ETI to stop activities relating to the transition to retail competition. *See* Tex. Util. Code Ann. § 39.452 (i). Accordingly, ETI remains subject to traditional rate regulation. *Id.* § 39.452(a).

**II.    Under traditional ratemaking principles, a utility is entitled to a reasonable opportunity to recover all of its reasonable and necessary expenses and to earn a return on its investment.**

PURA sets the framework for setting electric utility rates in Texas. *See generally* Tex. Util. Code Ann. Ch. 36. Under PURA and applicable constitutional principles, a utility is entitled to rates that afford it a "reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of the utility's reasonable and necessary operating expenses." *Id.* § 36.051; *Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 603 (1944); *Bluefield Waterworks & Improvement Co. v. Public*

2

*Serv. Comm'n of State of W.Va.*, 262 U.S. 679, 692 (1923). In plain English, that means a rate for a utility like ETI does two, separate things: enables the utility to pay its expenses and to earn a return on its investment. Regarding the former, PURA mandates that the Commission enable a utility to recover *all* of its reasonable and necessary expenses. Tex. Util. Code Ann. § 36.051; *see also Texas Coast Utils. Coalition v. Railroad Comm'n of Tex.,* 423 S.W.3d 355, 367 (Tex. 2014) (citing *Railroad Comm'n of Tex. v. High Plains Natural Gas Co.,* 628 S.W.2d 753 (Tex. 1981)) (construing materially analogous provision in Gas Utility Regulatory Act).

In Texas, electric utility rates are set for an indefinite period in the future. *E.g.,Oncor Elec. Delivery Co. LLC v. Public Util. Comm'n of Tex.,* 406 S.W.3d 253, 263 (Tex. App. – Austin 2013, no pet.); *City of El Paso v. Public Util. Comm'n of Tex.*, 344 S.W.3d 609, 613 (Tex. App. – Austin 2011, no pet.). To set a rate, the Commission projects the amount of money the utility will need to cover both its expenses and a return on its investment. The total is called the utility's "revenue requirement" or "cost of service." *See, e.g., City of El Paso v. Public Util. Comm'n of Tex.,* 883 S.W.2d 179, 187 (Tex. 1994) (ratemaking formula determines "revenue requirement"); *Suburban Util. Corp. v. Public Util. Comm'n of Tex.,* 652 S.W.2d 358, 362 (Tex. 1983) (ratemaking formula determines "cost of service"); *City of Dallas v. Railroad Comm'n of Tex.,* No. 03-06-00580-CV, 2008

3

WL 4823225 *1 (Tex. App. – Austin Nov. 6, 2008, no pet.) (not designated for publication) (using "revenue requirement" and "cost of service" to describe the same thing); 16 Tex. Admin. Code § 25.231 (PUCT's basic ratemaking rule entitled "cost of service").

The Commission has adopted a rule governing this process. To calculate a utility's expected cost of service, the Commission examines the utility's costs from a historical "test year." *See* 16 Tex. Admin. Code § 25.231(a). The Commission evaluates the reasonableness of the utility's test-year expenses and adjusts them for "known and measurable" changes that occur after the test year. *Id.* § 25.231(b); *see also Oncor Elec. Delivery Co. LLC*, 406 S.W.3d at 263. The Commission also determines what level of capital investment (or rate base) is reasonable, and then determines a reasonable rate of return on that investment. *E.g., Suburban Util. Corp.,* 652 S.W.2d at 362. The Commission adds the expense and return components together to calculate the utility's total cost of service. The Texas Supreme Court has acknowledged that a central goal of this process is to arrive at cost recovery as representative as reasonably possible of the utility's "cost situation expected in the future." *City of El Paso*, 883 S.W.2d at 188; *see also Oncor Elec. Delivery Co. LLC,* 406 S.W.3d at 263.

Utilities have different classes of customer that have different purposes and needs. Examples of some customer classes are residential, large industrial, and

4

state institutions of higher education. The Commission allocates a utility's total cost of service among its various customer classes in a process called "rate design." 16 Tex. Admin. Code § 25.234; *Texas Alarm & Signal Ass'n v. Public Util. Comm'n of Tex.,* 603 S.W.2d 766, 768 n.2 (Tex. 1980). This process results in a separate "bundled" rate for each customer class going forward. The rate design process is intended to assign each class of customer its fair share of the utility's total cost of service.

**III.   The Texas legislature has required ETI to participate in a new program that creates new costs and guarantees ETI a way to recover them outside the traditional ratemaking framework.**

In 2005, the Texas legislature enacted a statute that required ETI to propose a new program through which some customers could obtain service outside the traditional paradigm. The legislature intended the new program to enable certain retail customers to contract for "competitive generation" instead of relying upon ETI's portfolio of resources at ETI's traditionally regulated rates. *See* Act of May 30, 2005, 79th Leg., R.S., ch. 1072 (HB 1567), § 1 (amended 2006 & 2009) (current version at Tex. Util. Code Ann. § 39.452 (b)).

> The provision governing this program currently reads:
>
> An electric utility subject to this subchapter shall propose a competitive generation tariff to allow eligible customers the ability to contract for competitive generation. The commission shall approve, reject, or modify the proposed tariff not later than September 1, 2010. The tariffs subject to this subsection may not be considered to offer a discounted rate or rates under Section 36.007, and the utility's rates

shall be set, in the proceeding in which the tariff is adopted, to recover any costs unrecovered as a result of the implementation of the tariff. The commission shall ensure that a competitive generation tariff shall not be implemented in a manner that harms the sustainability or competitiveness of manufacturers that choose not to take advantage of competitive generation. Pursuant to the competitive generation tariff, an electric utility subject to this subsection shall purchase competitive generation service, selected by the customer, and provide the generation at retail to the customer. An electric utility subject to this subsection shall provide and price retail transmission service, including necessary ancillary services, to retail customers who choose to take advantage of the competitive generation tariff at a rate that is unbundled from the utility's cost of service. Such customers shall not be considered wholesale transmission customers. Notwithstanding any other provision of this chapter, the commission may not issue a decision relating to a competitive generation tariff that is contrary to an applicable decision, rule, or policy statement of a federal regulatory agency having jurisdiction.

Tex. Util. Code Ann. § 39.452 (b).

This new "competitive generation service" or "CGS" program costs ETI money to develop and administer.[6] It also costs ETI money in that the CGS program permits eligible customers to contract for electric generation resources from alternative suppliers, which allows them to avoid paying some of ETI's costs that would otherwise be allocated to them under ETI's base rates.[7] Specifically, the program allows eligible customers to avoid generation, *i.e.,* production-related,

---

[6] AR Binder 3 (Docket No. 38951, ETI Exh. 101, Roach Supp. Direct at 15).
[7] Supp. AR Binder 3 (Docket No. 37744, ETI Exh. 4, Domino Direct at 12-13; Docket No. 37744, ETI Exh. 52, Hurstell Direct at 34; Docket No. 37744, ETI Exh. 9, May Direct at 9); AR Binder 3 (Docket No. 38951, ETI Exh. 91, May Supp. Direct at 2, 4, & 7).

6

costs. The customers continue to pay ETI for applicable transmission, distribution, and customer service costs.[8]

It is clear from the language of section 39.452(b) that the legislature recognized the implementation of this program may result in "unrecovered costs" to ETI. It is equally clear that the legislature intended the utility to recover "any" such costs.

## IV. The Commission has refused to permit ETI to recover all of the costs that result from the implementation of the new program.

In 2009, ETI initiated a general rate case because the rates then in effect did not adequately compensate it for its cost of providing service.[9] In accordance with PURA section 39.452(b), quoted above, ETI proposed a CGS program. The program consisted of three riders:

- a CGS Tariff, proposed to describe the mechanics of the program and to identify eligible customers as the Large Industrial Power Service ("LIPS") class of customers;

- a CGS Cost Rider ("CGSC"), designed to recover from CGS-eligible customers costs related to the start-up and ongoing operations incurred to implement the CGS program; and

- a CGS Unrecovered Service Cost Rider ("CGSUSC").[10]

The CGSUSC rider is the principal tariff at issue in this appeal. The CGSUSC rider was designed to recover, from non-participating customers, the

---

[8] Supp. AR Binder 3 (Docket No. 37744, ETI Exh. 9, May Direct at 15).
[9] Supp. AR Binder 3 (Docket No. 37744, ETI Exh. 4, Domino Direct at 5-10).
[10] Supp. AR Binder 3 (Docket No. 37744, ETI Exh. 9, May Direct Exh. PRM-1).

base rate costs that CGS customers would avoid by switching. That is, it was designed to recover the fixed costs of generating or acquiring electricity that do not change with changes in customer demand.[11] For example, CGS customers would avoid the costs of building and running power plants. They would also avoid the costs of capacity acquired under purchased power agreements.[12] ETI proposed to measure the costs at risk of non-recovery under the CGS program consistent with the way its rates for these bundled services were set. That is, ETI proposed to measure the embedded generation-related costs that migrating customers would have been expected to pay under traditional rates but for the CGS program.[13]

The Commission assigned Docket Number 37744 to the rate case proceeding. The parties eventually reached an agreement on all the issues in the case except those pertaining to the CGS program. An Administrative Law Judge ("ALJ") conducted an evidentiary hearing on the CGS issues.

---

[11] Supp. AR Binder 3 (Docket No. 37744, ETI Exh. 9, May Direct at 21); AR Binder 3 (Docket No. 38951, ETI Exh. 91, May Supp. Direct at 5-6).

[12] Supp. AR Binder 3 (Docket No. 37744, ETI Exh. 9, May Direct at 15; Docket No. 37744, Cities Exh. 6, Nalepa Direct at 58). "Capacity" is the amount of power a utility has available at any given time to serve customers. Utilities are required to have a percentage surplus or "cushion" of capacity available in reserve, in case demand exceeds expectations. Traditionally regulated utilities supply their need for capacity either from their own generating plants or by buying it from someone else. Some purchased power contracts are short term, but some are long term. Like other base rate expenses, "purchased capacity costs" are quantified during a test year and become a component of the utility's revenue requirement that forms the basis for prospective rates.

[13] Supp. AR Binder 3 (Docket No. 37744, ETI Exh. 9, May Direct at 21 & Exh. PRM-1, "Competitive Generation Service Unrecovered Service Cost Rider").

An ETI witness estimated that ETI would incur about $610,000 of costs to implement the program, and another $330,000 annually to keep it going.[14] Additionally, ETI estimated that, based upon the test year used in Docket No. 37744, the customers expected to be eligible for the CGS program (the LIPS class) represented approximately 23% of ETI's total demand and 32% of the Company's total sales.[15] ETI estimated that the revenue requirement resulting from ETI's embedded generation costs for the total load eligible for the CGS program was about $57.5 million.[16] This was the total amount of ETI production costs that eligible customers would avoid if they all took CGS service for their entire load. ETI acknowledged, however, that it could not precisely identify the level of unrecovered costs until the actual level of participation in the CGS program was known.[17]

After the evidentiary hearing, the ALJ issued a proposal for decision on the CGS issues. The ALJ recommended that the CGS program be rejected altogether, one of the options authorized by the CGS statute. *See* Tex. Util. Code Ann. § 39.452(b). The basis of the ALJ's decision was his conclusion that though the program would definitely result in unrecovered costs for ETI, the only feasible way for the Company to recover them in compliance with PURA section 39.452(b)

---

[14] Supp. AR Binder 3 (Docket No. 37744, ETI Exh. 9, May Direct at 19).
[15] Supp. AR Binder 3 (Docket No. 37744, ETI Exh. 9, May Direct at 13).
[16] Supp. AR Binder 3 (Docket No. 37744, ETI Exh. 9, May Direct at 14).
[17] AR Binder 3 (Docket No. 38951, ETI Exh. 101, Roach Supp. Direct at 21).

9

would be to charge the unrecovered costs to customers that did not participate in the program. The ALJ perceived this result as unfair.[18]

The Commission did not adopt the ALJ's proposal. Instead, the Commission severed the CGS issues from the rate case and established a new docket for them to be addressed. The Commission ordered that the record from the rate case be included in the new CGS docket.[19] The Commission assigned Docket Number 38951 to the new CGS docket, and urged the parties to attempt to settle as many CGS-related issues as possible.

In the new docket, the parties reached agreements on many of the outstanding issues. They filed several stipulations of fact, as well as partial settlements addressing discrete elements of the program. They were unable to agree, however, on the meaning of the phrase "costs unrecovered as a result of implementation of the CGS program tariff" in PURA section 39.452(b).

The Commission issued an interim order on this issue. In that order, the Commission disagreed with the ALJ's proposal for decision and determined that the term entitles ETI to recover only "costs to implement and administer the CGS program," not "lost revenues, embedded generation costs, or any other types of costs." In other words, the Commission determined as a matter of law that the

---

[18] *See* Supp. AR Binder 2, Item 36 (Docket No. 37744, Proposal for Decision at 2-3).

[19] The rate case record was voluminous, and much of it did not pertain to the CGS issue. Only the pieces of the record in Docket No. 37744 that the parties to the district-court proceeding identified as relevant have been included in the record. Again, those pieces comprise the Supplemental Administrative Record, Joint Exhibit 2 of the Reporter's Record.

statutory term "unrecovered costs" did not include unrecovered "embedded generation costs." The Commission, therefore, concluded that ETI could not implement its proposed CGSUSC rider.[20]

After issuance of the interim order, the parties filed supplemental testimony. Some (but not all) of the parties reached another agreement on unresolved issues.[21] The Commission ultimately adopted some aspects of that agreement, but rejected other aspects of it. In the end, the Commission issued a final order that adopted CGS and CGSC riders but not a CGSUSC rider.[22]

In its final order, the Commission incorporated its interim order. The agency expressly ruled that ETI may recover only the costs necessary to "implement and administer" the CGS program, and not "lost revenues, embedded generation costs, or any other types of costs."[23] The Commission even excluded from evidence the "CGSUSC" rider that ETI proffered in its supplemental testimony on the ground that the Commission's interim decision rendered it "irrelevant."[24] The Commission further imposed a limitation on ETI's ability to recover CGS implementation costs. That is, the Commission ruled that ETI could not accrue (or, consequently, recover) implementation costs incurred before the

---

[20] AR Binder 1, Item 77 (Docket No. 38951, Interim Order at 5-7 & FOFs 38-40).
[21] AR Binder 2, Item 113 (Docket No. 38951, May 17, 2013 Stipulation and Settlement Agreement at 4).
[22] AR Binder 2, Item 119 (Docket No. 38951, July 19, 2013 Order).
[23] AR Binder 2, Item 119 (Docket No. 38951, July 19, 2013 Order at 7-8 & FOFs 50-51).
[24] AR Binder 2, Item 25 (Docket No. 38951, Order No. 11).

11

CGSC rider was approved.[25] The Commission also declined to authorize ETI to recover interest on its unrecovered balance of CGSC rider costs.[26]

ETI filed a motion for rehearing challenging each of these decisions.[27] The motion was overruled by operation of law. ETI then filed a suit for judicial review of the Commission's decisions on these issues.[28] The district court, Judge Amy Clark Meachum presiding, summarily affirmed the Commission's order.[29] ETI appeals that judgment to this Court.

## SUMMARY OF THE ARGUMENT

The Commission erred as a matter of law when it determined that "any costs unrecovered as a result of the implementation of" the CGS program includes only the costs of implementing and administering the program. The Commission's decision violates the plain language of PURA section 39.452(b), which does not circumscribe the categories of cost eligible for recovery. The decision also violates other provisions of the statute, which evidence the legislature's intent that "unrecovered costs" be determined using the same test-year production costs that are used to determine base rates, and that the program not constitute a "discounted rate," enabling ETI to allocate unrecovered base rate costs to customers who do not

---

[25] AR Binder 2, Item 119 (Docket No. 38951, July 19, 2013 Order at FOF 57A).
[26] AR Binder 2, Item 119 (Docket No. 38951, July 19, 2013 Order at FOF 57C).
[27] AR Binder 2, Item 121 (Docket No. 38951, ETI's Aug. 8, 2013 Motion for Rehearing).
[28] CR 4-19.
[29] CR 523-26.

participate in the CGS program. The Commission is bound to give effect to the legislature's mandates.

The Commission is also bound to adhere to a more fundamental principle of utility ratemaking. That is, the Commission must set rates that afford a utility a reasonable opportunity to recover *all* of its reasonable and necessary operating expenses. By excluding a significant chunk of ETI's expenses from eligibility for recovery under CGS program tariffs, the Commission violated this principle.

The only legal justification the Commission gave for its decision is this Court's opinion in *CenterPoint Energy Houston Electric, LLC v. Public Util. Comm'n of Tex.,* 354 S.W.3d 899 (Tex. App. – Austin 2011, no pet.). This Court in that case construed a different statute that is worded in materially different language from the CGS statute. Viewed in context, the Court's reasoning in *CenterPoint Energy Houston Electric* does not support the Commission's decision – it actually undermines the Commission decision. There is no legal justification for the Commission's disregard of a clear legislative mandate. The decision to render production costs unrecoverable is entitled to no deference and must be reversed.

The Commission further erred in determining that ETI may not recover costs it incurred to put the legislatively mandated CGS program in place. Again, PURA section 39.452(b) allows ETI to recover any and all costs that result from

13

implementation of the program. Because the program cannot be implemented without start-up costs, the Commission's decision violates the statute and must be reversed.

Finally, the Commission erred as a matter of law in deciding not to authorize the recovery of interest on CGS implementation costs. The Texas Supreme Court has confirmed that when PURA expressly confers upon a utility a right to recover certain costs, PURA impliedly entitles the utility to recover interest on those costs until they are recovered. *See CenterPoint Energy, Inc. v. Public Util. Comm'n of Tex.,* 143 S.W.3d 81, 84 (Tex. 2004). Regardless of when ETI was entitled to begin accruing implementation costs, ETI is entitled to interest on recoverable amounts until they are recovered. The Commission's order to the contrary must be reversed.

## ARGUMENT

I.    **The Commission erred in determining that "unrecovered costs," as contemplated by PURA section 39.452(b), include only the costs necessary to implement and administer the CGS program, and do not include "lost revenues, embedded generation costs, or any other types of costs."**

    A.    **The Commission's decision is inconsistent with the plain language of PURA section 39.452(b).**

PURA section 39.452(b) says that a utility's rates "shall be set … to recover any costs unrecovered as a result of the implementation of the tariff." Tex. Util.

14

Code Ann. § 39.452(b). As the ALJ correctly observed,[30] the statute does not limit the categories of cost that are subject to this requirement. So long as a cost flows from the implementation of the CGS program and is not otherwise recovered, it falls within the express language of the statutory mandate.

As noted above, ETI proved there are several categories of costs that may be unrecovered as a result of the implementation of the CGS program. There are costs directly associated with the development of the program itself and carrying costs between the time of expenditure and recovery. Also, under the traditional ratemaking paradigm, ETI's rates, and the revenue requirement used to establish them, are required by statute and Commission rule to be designed to recover the embedded production costs the Company incurs to serve each and every one of its customers. Tex. Util. Code Ann. § 36.051; 16 Tex. Admin. Code § 25.231(a) & (b). With every customer that migrates to the CGS program, ETI is not recovering through base rates charged to that customer the fixed costs it has previously incurred to provide electricity to that customer. For example, if the fixed test-year cost of serving ten customers is shown to be $50 million, but those ten customers migrate to the CGS program, the utility is at risk of not recovering that $50 million from anyone.

---

[30] Supp. AR Binder 2, Item 36 (Docket No. 37744, Proposal for Decision at 23).

The legislature understood this and mandated that ETI be allowed to recover "any" costs that would otherwise be unrecovered as a result of implementing the program. Tex. Util. Code Ann. § 39.452(b). Even though this mandate is expansive and unlimited in category of cost, the Commission dramatically circumscribed the categories of costs eligible for recovery. The Commission found that the only costs recoverable under the CGS statute are the costs "to implement and administer the CGS program tariff."[31] The Commission did not (nor can it) point to any language in the statute that supports its interpretation.

First and foremost, statutes must be construed according to their plain language. *E.g., State v. Shumake,* 199 S.W.3d 279, 284 (Tex. 2006). The Commission reads the statute as requiring reimbursement for only the costs "of implementing" the program, giving the phrase "unrecovered as a result of" no meaning. The Commission has written that phrase out of the statute. It is well established that the legislature is presumed to have chosen its words with care, and that statutes should not be construed to render legislatively enacted words superfluous. *E.g., Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue,* 271 S.W.3d 238, 256 (Tex. 2008). The Commission's erroneous construction of the clear, unambiguous words of the CGS statute is not entitled to any deference. *E.g., Texas Coast Utils. Coalition,* 423 S.W.3d at 363 n.16; *Ojo v. Farmers Group, Inc.,*

---

[31] AR Binder 2, Item 119 (Docket No. 38951, July 19, 2013 Order at 23 & FOF 51).

16

356 S.W.3d 421, 443 (Tex. 2011) (Willett, J., concurring) ("This Court does not consider agency interpretations of unambiguous statutes."); *Railroad Comm'n of Tex. v. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 634 (Tex. 2011) (Jefferson, C.J., concurring) ("We do not defer to agency interpretations of unambiguous statutes."). The Commission's decision must be reversed on this basis alone.

**B.    The Commission's decision also contradicts the framework for cost recovery established in PURA section 39.452(b).**

The Commission's decision not only flatly ignores the absence of any limitation on costs eligible for recovery and the legislature's express confirmation that "any" costs be included. The decision also contradicts other language in the statute.

First, the cost recovery framework of section 39.452(b) includes the requirement that "unrecovered costs" be identified, and rates be "set, in the [same] proceeding in which the tariff is adopted," to recover those costs. Thus, the statute plainly contemplates that the level of "unrecovered costs" will be determined based on the same test-year production costs that are used to determine base rates. By excluding embedded production-related base rate costs from the definition of "unrecovered costs," the Commission has violated this key requirement of the statute.

17

Second, the legislature not only entitled ETI to recover costs, but it said some things that affect who may and may not pay them. The legislature prohibited the program from prejudicing eligible customers who choose not to participate in it. *See* Tex. Util. Code Ann. § 39.452(b). The logical result of that prohibition is that costs avoided by participating customers may not be assigned to customers who are eligible but opt out. The legislature did not, however, say anything that prohibits costs from being recovered from other customers. In fact, the legislature expressly opened the door for recovering costs from other customers. That invitation is embodied in the legislature's reference in the CGS statute to another provision of PURA – section 36.007. Tex. Util. Code Ann. § 39.452(b) ("The tariffs subject to this subsection may not be considered to offer a discounted rate or rates under Section 36.007….").

Section 36.007 generally governs what happens when a utility gives a customer a "discounted rate." That provision prevents a utility from recovering in its base rates, which are charged to all customers that take service under traditional regulation, the "allocable costs of serving customers paying discounted rates under this section…." *Id.* § 36.007. That is, section 36.007 prohibits a utility from giving one customer a discount, and then saddling another customer with the costs the first one avoided. The result is that, generally, a utility risks having unrecovered costs if it chooses to give a customer a discounted rate.

18

But the legislature said the CGS program may *not* result in a "discounted rate." By saying so, the legislature effectively removed the general prohibition on shifting costs to customers who do not pay a discount, and confirmed that ETI must be allowed to recover the full allocable costs of serving customers even after they migrate to the CGS program. The Commission's constricted definition of "unrecovered costs" leaves ETI in the same position regarding cost recovery as if it were charging a discount rate.[32] In this respect, the decision violates the language of section 39.452(b).

The Commission and intervenors have characterized the assignment of costs to non-participating customers as unfair. These arguments ignore that the legislature – not ETI – has required this result. There is no way to implement the CGS program in conformity with the terms of the CGS statute without, in some manner, creating a preferential rate or assigning costs to customers that may not cause them. There is no free lunch, and the legislature dictated that ETI not pick up the tab for the special deal it authorized for certain customers. It gave the Commission the power to cancel the lunch altogether if it could not find a way to pay for it equitably, but did not give the Commission the power to host the lunch at the utility's expense.

---

[32] Supp. AR Binder 3 (Docket No. 37744, ETI Exh. 76, May Rebuttal at 26); AR Binder 3 (Docket No. 38951, ETI Exh. 91, May Supp. Direct at 8); Supp. AR Part IV, Vol. E (Docket No. 37744, 7/20/2010 Tr. at 341-48).

PUCT Chairman Smitherman acknowledged this fact in his public discussion of the CGS program. Speaking to ETI, he said, "[I]t's clear you're not supposed to shoulder the burden of this [program] …" and "[U]nder no circumstances will you eat it [the costs of the program] …."). [33] Nevertheless, the Commission has chosen to implement a CGS program *and* prevent ETI from recovering costs that may be unrecovered as a result of its implementation.

The Commission is bound to adhere to the strictures of its enabling statute. *E.g., Texas Coast Utils. Coalition,* 423 S.W.3d at 359-60 ("As a statutorily created body, the Commission has no inherent authority, and instead has only the authority that the Legislature confers upon it."). The Commission may not violate the plain language of PURA.

### C. This Court's decision in *CenterPoint Energy Houston Electric, LLC v. Public Util. Comm'n of Tex*. does not support the Commission's decision.

The only legal basis the Commission articulated in its order to support its definition of "unrecovered costs" was this Court's decision in *CenterPoint Energy Houston Electric, LLC v. Public Util. Comm'n of Tex.,* 354 S.W.3d 899 (Tex. App. – Austin 2011, no pet.). The Commission characterized ETI's request for embedded production costs as a request for "lost revenues," and found:

> 50. In *CenterPoint,* the Third Court of Appeals found that because the language of PURA § 39.905 did not specifically provide for

---

[33] Supp. AR Part IV, Vol. F (Docket No. 37744, Nov. 10, 2010 Open Meeting Tr. at 179 & 210).

20

recovery of "lost revenues" and that in at least two other provisions of PURA the legislature expressly distinguishes "costs" from "revenues," the term "costs," as used by the legislature in PURA § 39.905, is not intended to include lost revenues. Like PURA § 39.905, PURA § 39.452(b) only provides for "costs unrecovered as a result of implementation of the tariff" and does not specifically provide for the utility to recover lost revenues or any other type of costs.[34]

According to the Commission, this Court in *CenterPoint Energy Houston Electric* decided that the term "costs," everywhere it appears in PURA, is not intended to include "lost revenues." This Court did not so hold. Even if it had, the holding would not support the Commission's decision in this case.

**1.      This Court in *CenterPoint Energy Houston Electric* construed a different statute that had different language and a different purpose.**

*CenterPoint Energy Houston Electric* concerned a Commission rule implementing a PURA provision that governed an energy efficiency program. In PURA section 39.905, the legislature directed utilities to implement energy efficiency programs to reduce the state's demand for electricity. Tex. Util. Code Ann. § 39.905. The legislature directed the Commission to establish "energy efficiency cost recovery factors" ("EECRFs") under which utilities could recover the expenditures they made to satisfy the legislature's energy efficiency goals. *Id.* § 39.905(b)(1). The legislature further required a mechanism by which a utility's EECRF would periodically be trued-up to "reflect any over-collection or under-

---

[34] AR Binder 2, Item 119 (Docket No. 38951, July 19, 2013 Order at 22-23 & FOF 50).

21

collection of energy efficiency cost recovery revenues in previous years." *Id.* § 39.905(b-1). CenterPoint contended these provisions required the Commission to afford it an opportunity to recover not only the expenditures it made to implement its program, but also revenues it lost as a result of the program's success in reducing demand for electricity. This Court disagreed, holding that the EECRF statute precluded the Commission from accounting for "lost revenues" in the reconciliation mechanism. *CenterPoint Energy Houston Electric,* 354 S.W.3d at 905.

The *CenterPoint Energy Houston Electric* decision does not inform the question presented in this case. The language of the EECRF statute is materially different from the language of the CGS statute. The EECRF statute authorizes "cost recovery for utility *expenditures made to satisfy the goal of this section….*" Tex. Util. Code Ann. § 39.905(b)(1) (emphasis added). The use of the term "expenditures," and the qualification of eligible expenditures as those made *for the purpose of satisfying* the energy efficiency program goal, circumscribe the universe of costs eligible for recovery under the EECRF. The Court determined that this language, "[c]onsidered in context," indicates an intent for a utility to recover "out-of-pocket expenditures associated with its implementation of energy-efficiency programs, not to compensate a utility for any associated lost revenues attributable to those programs." *CenterPoint,* 354 S.W.3d at 904.

22

The CGS statute, in contrast, requires that "rates shall be set … to recover *any* costs unrecovered *as a result of* the implementation of the tariff." *Id.* § 39.452(b) (emphasis added). The CGS language is broader than the EECRF language. "Any" costs means just that, including fixed production costs incurred to provide electric service to customers who ultimately migrate to the CGS program. In contravention of this language, the Commission has categorically precluded ETI from recovering these costs via the CGSUSC rider. This Court's construction of the EECRF statute does not speak to the proper construction of the CGS statute, much less bind the Commission to misconstrue the latter.

### 2. The Court's reasoning in the *CenterPoint Energy Houston Electric* case does not support the Commission's decision here.

The Commission cites the *CenterPoint Energy Houston Electric* decision as support for the broad proposition that the concepts of "costs" and "revenues" are distinct throughout PURA, such that express authority to recover "costs" is never authority to recover "revenues" the utility has lost as the result of the implementation of one program or another.

### a. This Court did not distinguish "costs" and "revenues" for all purposes.

This Court did not say that. The only issue before the Court in *CenterPoint* was the scope of costs recoverable under the EECRF statute. CenterPoint argued that the cost-recovery provisions of the EECRF statute authorized utilities to

23

recover not only the direct costs of implementing the energy efficiency program, but also "revenues" lost as a *result of* implementing that program. In rejecting that argument, the Court first examined the express language of the energy efficiency provisions. The Court then observed that the legislature in two other places in PURA distinguished between "costs" and "revenues." *CenterPoint Energy Houston Electric,* 354 S.W.3d at 903-04. The Court said, "[t]hese provisions further support our conclusion that the term 'costs,' as used by the legislature in PURA, is not intended to include lost revenues." *Id.* at 904. This discussion appeared in the context of construing the EECRF provision. The Court certainly did not cite or discuss the CGS provision. It is clear from the language of the CGS statute that the legislature *did* intend the utility to recover costs that *result from* implementing that program. Those are the very words of the statute.

### b. Regardless, ETI indisputably sought "costs" here.

Furthermore, the facts before this Court in *CenterPoint Energy Houston Electric* were fundamentally different from those presented in this case. CenterPoint asked to recover "lost revenues" that were not tied to the particular category of "expenditure" it was entitled to recover under the EECRF statute. ETI in contrast, does not seek "lost revenues" different from or in addition to the "costs" it is entitled to recover under the statute. ETI gets to recover "any" costs that *result from* CGS program implementation, including production costs.

24

None of the experts in this case disputed that the CGS program could lead to unrecovered "costs" of the type claimed by ETI, and the ALJ agreed it would.[35] While intervenor and Staff experts argued that certain alleged benefits of the CGS program, or revenues from load growth, might be available to offset ETI's unrecovered costs, they did not say that the Company could not experience unrecovered production costs. This fact is confirmed in the agreement on how to quantify the rate reduction that CGS customers earn by switching from traditional rates. The credit is explicitly based on the level of ETI's fixed production costs that CGS customers are able to avoid paying by switching.[36]

Logically, then, ETI proposed to measure its unrecovered costs caused by migrating LIPS customers by calculating "the difference between what would have been billed under traditional LIPS service and the amounts collected under CGS service."[37] What would have been billed may logically be termed "revenues." But even assuming *arguendo* that a utility cannot recover lost "revenues" without the

---

[35] Supp. AR Binder 2, Item 36 (Docket No. 37744, Proposal for Decision at 2-3 & 21-22); Supp. AR Binder 4 (Docket No. 37744, OPUC Exh. 1, Johnson Direct at 85 & 88 ("The CGS-USC rider will allow the company to flow through unrecovered embedded cost to other customer classes."); Docket No. 37744, Kroger Exh. 1, Higgins Direct at 6; Docket No. 37744, State Agencies Exh. 2, Pevoto Direct at 39-41; Docket No. 37744, TIEC Exh. 1, Pollock Direct at 51-52 & Exh. JP-16); AR Binder 3 (Docket No. 38951, ETI Exh. 91, May Supp. Direct at 6-7); Supp. AR Part IV, Vol. E (Docket No. 37744, 7/20/2010 Tr. at 261-63).

[36] AR Binder 2, Item 113 (Docket No. 38951, Stipulation and Settlement Agreement ¶ A.1 & Attachment 1, "Competitive Generation Service" tariff at ¶ VI.B; Docket No. 38951, July 19, 2013 Order at FOF 41.c. 2-4); AR Binder 3 (Docket No. 38951, ETI Exh. 101, Roach Supp. Direct at 7-8).

[37] Supp. AR Binder 3 (Docket No. 37744, ETI Exh. 9, May Direct at 21); AR Binder 3 (Docket No. 38951, ETI Exh. 91, May Supp. Direct at 6-7).

legislature expressly saying so, the Commission reached the wrong decision here. Though "costs" and "revenues" may not be the same in all contexts, they *are* the same in the context of what ETI was seeking in this case.[38]

In the test-year ratemaking construct, a utility's revenues are designed to recover exactly the amount of its costs.[39] A utility's "revenue requirement" is its "cost of service." And just as test-year expenses determine what a utility's anticipated future revenue requirement will be for a particular class, a utility's anticipated revenue requirement for a class of customers establishes what are indisputably the costs of serving those customers. Unlike CenterPoint, ETI is not seeking to recover lost revenues in addition to, or instead of, a category of costs that are guaranteed by a statute. The costs ETI seeks here – and the "revenues" that the Commission says the Company seeks – are the same thing. The ALJ understood this reality.[40]

Even this Court in *CenterPoint Energy Houston Electric* recognized a connection between eligible costs and revenues when it discussed the EECRF true-up provision. That is, the Court acknowledged that CenterPoint was entitled to

---

[38] Supp. AR Binder 4 (Docket No. 37744, OPUC Exh. 1, Johnson Direct at 88 ("Revenues are intended to equal embedded cost of service for the adjusted test year.")); Supp. AR Binder 3 (Docket No. 37744, ETI Exh. 76, May Rebuttal at 28); AR Binder 3 (Docket No. 38951, ETI Exh. 92, May Supp. Rebuttal at 4-5).

[39] AR Binder 3 (Docket No. 38951, ETI Exh. 91, May Supp. Direct at 7; Docket No. 38951, ETI Exh. 92, May Supp. Rebuttal at 4); Supp. AR Binder 4 (Docket No. 37744, OPUC Exh. 1, Johnson Direct at 88; Docket No. 37744, TIEC Exh. 1, Pollock Direct at 51-52 & Exh. JP-16 (recognizing that ETI could incur unrecovered costs)).

[40] Supp. AR Binder 2, Item 36 (Docket No. 37744, Proposal for Decision at 22).

recover revenues equal to its EECRF costs. *CenterPoint Energy Houston Electric,* 354 S.W.3d at 901. The Court simply found that CenterPoint was seeking revenues unrelated to the narrow class of costs the EECRF statute addressed -- those related to setting up and running the EECRF program. The same logic, applied to the broader language of the CGS statute, leads to the inescapable conclusion that ETI is entitled to recover all the costs it incurred (or, stated differently, revenues it would have received to cover those costs) but for the CGS program. Thus, though the *CenterPoint Energy Houston Electric* decision is not on point because it addresses statutory language fundamentally different from the CGS statute, this Court's reasoning in that case undermines the Commission's decision in this case.

### D. The Commission's decision runs afoul of the principle espoused in *High Plains* and its progeny.

The Commission's decision not only violates the language and intent of PURA section 39.452(d), it also violates a more fundamental tenet of Texas utility ratemaking also embodied in that statutory language. That is, as noted above, PURA requires that a utility's rates be set to permit it to recover *all* of its reasonable and necessary operating costs. Tex. Util. Code Ann. § 36.051. The Texas Supreme Court construed a materially identical requirement in the Gas Utility Regulatory Act and concluded that the Railroad Commission violated the requirement by adopting a tariff that provided for less than 100% of the utility's

27

cost recovery. The Court noted that the statutory language at issue "mandates that the Commission structure a system that will permit the utility to recover all of its operating expenses." *See High Plains Natural Gas Co.,* 628 S.W.2d at 753. The Texas Supreme Court last year reiterated the same principle, citing *High Plains Natural Gas Co.,* in upholding a Railroad Commission tariff that was designed to give the utility the opportunity to recover all of its reasonable and necessary costs. *See Texas Coast Utils. Coalition,* 423 S.W.3d 367. The Commission's decision in this case, like the Railroad Commission's decision in *High Plains,* categorically renders ineligible for recovery certain costs that are indisputably reasonable and necessary for the utility to provide service to customers. This is contrary to law and must be reversed.

### E. The *quantity* of production costs eligible for recovery is not at issue here -- the Commission never reached that issue.

There was much debate before the Commission and district court over the extent to which ETI's embedded production-related costs will actually be unrecovered, and the extent to which unrecovered costs might be offset or mitigated upon implementation of the CGS program. Indeed, both the Commission and intervenor Texas Industrial Electric Consumers ("TIEC") argued that the basis of the Commission's decision was a determination that none of ETI's embedded production costs will be unrecovered as a result of the CGS program. These parties will likely make the same argument again. It has no merit.

28

The Commission did not make a factual determination that ETI will not have any unrecovered costs as a result of CGS program implementation.

The Commission said:

> The Commission finds that unrecovered costs are only those costs necessary to implement and administer the CGS program and are not to be *defined* to include lost revenues, embedded generation costs, or any other types of costs.
>
> ***
>
> In making its determination of the *definition* of unrecovered costs, the Commission follows the precedent set in *CenterPoint Energy Houston Electric, LLC v. Pub. Util. Comm'n*, 354 S.W.3d 899 (Tex. App. – Austin, 2011 no pet.) … Like PURA § 39.905, PURA § 39.452 (b) [the CGS statute] only provides for "costs unrecovered as a result of implementation of the tariff" and does not specifically provide for the utility to recover lost revenues or any other type of costs.
>
> Based on the evidence and testimony, the Commission finds that the proper *interpretation* of "costs unrecovered as a result of implementation of the CGS program tariff" is costs to implement and administer the CGS program tariff. Such unrecovered costs do not include lost revenues, embedded generation costs, or any other types of costs. The Commission reverses the proposal for decision on this issue.[41]

In short, the Commission's order is based solely upon its interpretation of the CGS statute. The Commission did not reach the issue of how much of ETI's costs will be unrecovered as a result of implementing the CGS program, because the Commission defined the term "unrecovered costs" in a way that precludes the

---

[41] AR Binder 2 (Docket No. 38951, Final Order at 6, 7-8; *see also* FOFs 49-51) (emphasis added; footnotes omitted)).

29

issue from arising. The Commission concluded that the words "any unrecovered costs" in PURA section 39.452(b) include *only* the costs of implementing and administering the CGS program. That is the only reason the Commission gave for rejecting the proposed CGSUSC rider, which was designed to recover embedded production costs avoided by participating CGS customers.

To be clear, the debate on appeal is not whether -- or what -- costs will in fact be unrecovered. The question before this Court is whether ETI is statutorily entitled to recoup unrecovered, embedded production-related costs of serving customers that migrate to the CGS program. The Commission answered that question in the negative. This Court must reverse that decision because it contravenes the clear language and intent of PURA section 39.452(b).

## II. The Commission erred in determining that ETI may not recover CGS implementation costs prior to the date that the CGSC rider is approved.

In addition to its request to recover, via its CGSUSC rider, all embedded production-related costs that are unrecovered as a result of customers migrating to the CGS program, ETI sought to recover through its CGSC rider all the costs of implementing and administering the CGS program. Though the Commission apparently recognized that ETI is entitled to recover its costs of implementing and administering the program, the Commission improperly narrowed the universe of costs that qualify. The Commission decided that ETI "should not be able to

recover any costs via the CGSC rider until the CGS program is implemented."[42]

The Commission found:

> 57A. The appropriate date upon which ETI is authorized to begin accruing CGS program implementation and administration costs is the date that the CGS Rider implemented [sic].[43]

The effect of this ruling is to prevent ETI from recovering the lion's share of the CGS implementation costs it has incurred in the conduct of this proceeding and in its previous good faith efforts to reach agreement with the parties on a host of issues related to the design of the CGS program and tariffs. These collaborative efforts among the parties led to stipulations on the vast majority of the elements of the CGS program and tariffs. Before the underlying proceeding had concluded, ETI had already incurred over $900,000 in costs toward implementation of the program.[44]

The Commission's decision on this issue violates the plain language of PURA section 39.452(b). Again, that statute requires that ETI be allowed to recover "any costs unrecovered as a result of the implementation of the [CGS] tariff…." Tex. Util. Code Ann. § 39.452(b). The statute does not limit recoverable

---

[42] AR Binder 2, Item 119 (Docket No. 38951, July 19, 2013 Order at 9).

[43] AR Binder 2, Item 119 (Docket No. 38951, July 19, 2013 Order at 25 & FOF 57A).

[44] AR Binder 3 (Docket No. 38951, ETI Exh. 101, Roach Supp. Direct at 15). There is a small amount of CGS-related expense (approximately $300,000) that forms part of the test-year costs upon which ETI's base rates were established in Docket No. 37744. ETI proposed to credit that amount under the CGSC rider, so the costs will not be recovered twice. AR Binder 3 (Docket No. 38951, ETI Exh. 101, Roach Supp. Direct at 15; Docket No. 38951, ETI Exh. 103, Roach Supp. Rebuttal at 3).

costs to those incurred in any particular time period. The provision contemplates recovery of *all* CGS tariff implementation costs, regardless of when they are incurred.

This is not the first time the Commission has assigned an unduly narrow meaning to the concept of program implementation. In the docket underlying *CenterPoint Energy Houston Electric, LLC v. Public Util. Comm'n of Tex.,* 408 S.W.3d 910 (Tex. App. – Austin 2013, pet. denied) ("*CenterPoint Energy Houston Electric II*"), the Commission decided CenterPoint was not entitled to a performance bonus on energy efficiency programs funded by $10 million in settlement proceeds. The basis for the Commission's decision was that although performance bonuses were due on programs "implemented under" the Commission's rule, the programs at issue were implemented under a settlement, not the rule. In reversing the Commission's decision, this Court noted, "the PUC's position here unnecessarily complicates what is fairly standard statutory and regulatory language. 'Implement' simply means 'carry out.'" *CenterPoint Energy Houston Electric II,* 408 S.W.3d at 917. The Court applied this common-sense meaning to the word, holding that CenterPoint was entitled to a performance bonus on all its programs "carried out" to achieve the energy efficiency goals of the rule, so long as they met the other requirements of the rule, regardless of the source of program funding.

32

The same common-sense meaning should be applied to the word "implementation" in the CGS statute. Furthermore, the Court should give effect to the breadth of the CGS entitlement. That is, in the CGS statute, the legislature not only entitled the utility to the costs *of* implementing the program; the legislature also entitled the utility to the unrecovered costs that *result from* implementing the program. Without incurring the costs of proposing, negotiating, and developing the CGS tariff (and the associated CGSC and CGSUSC riders), the program could not be implemented or "carried out."[45] The costs incurred to develop the tariff and riders are just as much a result of program implementation as are the costs incurred after they are adopted and go into effect. Moreover, excluding recovery of any of these costs is inconsistent with the legislative intent, discussed above, that ETI not subsidize the implementation of the CGS program and tariffs. In short, the Commission's limitation of the time frame for accrual of CGS implementation costs is contrary to PURA section 39.452(b) and must be reversed.

---

[45] AR Binder 3 (Docket No. 38951, ETI Exh. 103, Roach Supp. Rebuttal at 2).

**III.    The Commission erred in deciding not to authorize the recovery of interest on CGS implementation costs.**

Finally, ETI requested to earn interest on the unrecovered balance of the CGSC rider charges.[46]  The Commission decided that ETI should not be permitted to recover interest on this balance.[47]  The Commission found:

> 57C.   It is not appropriate for ETI to recover interest on the unrecovered balance of the CGSC rider charges.[48]

The sole rationale for the Commission's decision is that it typically does not allow interest to accrue on the unamortized balance of legal and consulting expenses (*i.e.,* "rate case expenses") that utilities incur in prosecuting full, general rate cases.[49]

That is not a legitimate basis upon which to deny ETI interest on unrecovered CGSC rider charges.  Rate case expenses are not governed by PURA section 39.452(b), which assures, without exception, ETI's right to recover all costs associated with implementing the CGS program.  The time value of money that ETI must forego while it waits for the CGSC rider to be approved, and that it will just as surely forego between periods of adjustment to that rider, is an

---

[46] AR Binder 3 (Docket No. 38951, ETI Exh. 101, Roach Supp. Direct, Exh. DRR-SD-3 at 2 (Section V "True-Up Provision") and DRR-SD-6 (redline) at 2 (Section V "True-Up Provision")).

[47] AR Binder 2, Item 119 (Docket No. 38951, July 19, 2013 Order at 10).

[48] AR Binder 2, Item 119 (Docket No. 38951, July 19, 2013 Order at 25 & FOF 57C).

[49] AR Binder 2, Item 119 (Docket No. 38951, July 19, 2013 Order at 10).

unrecovered cost to the same extent as are the other CGS program implementation costs.[50]

The Texas Supreme Court's decision in *CenterPoint Energy, Inc. v. Public Util. Comm'n of Tex.*, 143 S.W.3d 81, 84 (Tex. 2004) confirms that when PURA expressly confers upon a utility a right to recover certain costs, PURA impliedly entitles the utility to recover interest on those costs until they are recovered. In *CenterPoint Energy, Inc.*, CenterPoint sought to accrue interest on stranded costs until they were quantified. PURA section 39.252(a) expressly authorized utilities like CenterPoint to recover their stranded costs that resulted from the introduction of retail competition into their service territories. Tex. Util. Code Ann. § 39.252(a). PURA did not expressly authorize utilities to earn interest on their unrecovered stranded costs. The Commission adopted a rule that precluded the utility from beginning to accrue interest on the stranded costs when they arose, and required the utility to wait to accrue interest until the stranded costs were quantified. The Texas Supreme Court invalidated the rule, holding that it was "inconsistent with the Legislature's intent, expressed in Chapter 39 of the PURA, that utilities fully recover their 'net, verifiable, nonmitigable stranded costs' … A two- or three-year gap in recovery of carrying costs would not permit generation

---

[50] AR Binder 3 (Docket No. 38951, ETI Exh. 101, Roach Supp. Direct at 17; Docket No. 38951, ETI Exh. 103, Roach Supp. Rebuttal at 6).

companies full recovery of their stranded costs as the Legislature envisioned."
*CenterPoint Energy, Inc.,* 143 S.W.3d at 84.

The Court's reasoning applies equally to this case. ETI is statutorily entitled to recover *all* of its costs of implementing the CGS program, including interest. The Commission, in denying ETI the right to earn interest on unrecovered amounts, violated PURA section 39.452(b). This Court must reverse the Commission's ruling on this issue.

## **PRAYER**

For all these reasons, Entergy Texas, Inc. respectfully requests that the Court reverse the district court's judgment insofar as it upholds the Commission's decision in the respects discussed above. ETI has the statutory right to recover: its embedded production-related costs that are unrecovered as a result of implementing the CGS program; costs ETI incurred to implement the program before the CGSC rider becomes effective; and interest on the unrecovered balance of costs incurred to implement the CGS program. ETI requests that this Court remand the case to the Commission for further proceedings consistent with the Court's decision. Finally, ETI requests its costs of court and any other relief to which it may show itself justly entitled.

Respectfully submitted,

**DUGGINS WREN MANN & ROMERO, LLP**


By:   */s/  Marnie A. McCormick*
    John F. Williams
    State Bar No. 21554100
    jwilliams@dwmrlaw.com
    Marnie A. McCormick
    State Bar No. 00794264
    mmccormick@dwmrlaw.com
    P. O. Box 1149
    Austin, Texas 78767-1149
    (512) 744-9300
    (512) 744-9399 *fax*

    **ATTORNEYS FOR APPELLANT**
    **ENTERGY TEXAS, INC.**


## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this document contains 9,085 words in the portions of the document that are subject to the word limits of Texas Rule of Appellate Procedure 9.4(i), as measured by the undersigned's word-processing software.


    */s/ Marnie A. McCormick*
    Marnie A. McCormick

## CERTIFICATE OF SERVICE

As required by Texas Rule of Appellate Procedure 9.5, I certify that on the 14th day of January, 2015, the foregoing document was electronically filed with the Clerk of the Court using the electronic case filing system of the Court, and that a true and correct copy was served on the following lead counsel for all parties listed below via electronic service:

Elizabeth R. B. Sterling
Megan M. Neal
Environmental Protection Division
Office of the Attorney General
P.O. Box 12548
Austin, TX  78711-2548
*Counsel for the Public Utility Commission of Texas*

Rex VanMiddlesworth
Benjamin Hallmark
Thompson & Knight LLP
98 San Jacinto Blvd., Ste. 1900
Austin, TX  78701
*Counsel for Texas Industrial Energy Consumers*

Sara J. Ferris
Office of Public Utility Counsel
1701 N. Congress Ave., Ste. 9-180
P.O. Box 12397
Austin, TX  78711-2397
*Counsel for Office of Public Utility Counsel*

*/s/ Marnie A. McCormick*
Marnie A. McCormick

## APPENDICES

A.    Final Order of the Public Utility Commission of Texas in Docket No. 38951

B.    Interim Order of the Public Utility Commission of Texas in Docket No. 38951

C.    Entergy Texas, Inc.'s Motion for Rehearing in Docket No. 38951

D.    Texas Utilities Code section 39.452(b)

E.    District Court's Judgment

# APPENDIX A

FINAL ORDER



RECEIVED

'2013 JUL 19 PM 3: 11

PUBLIC UTILITY COMMISSION
FILING CLERK

| APPLICATION OF ENTERGY TEXAS, | § | PUBLIC UTILITY COMMISSION |
|---|---|---|
| INC. FOR APPROVAL OF | § | |
| COMPETITIVE GENERATION | § | OF TEXAS |
| SERVICE TARIFF (ISSUES SEVERED | § | |
| FROM DOCKET NO. 37744) | § | |

## ORDER

### I.    Introduction

This order addresses Entergy Texas, Inc.'s (ETI's) application for a competitive generation service (CGS) under PURA § 39.452(b).  The Commission approves ETI's CGS rider and competitive generation service cost (CGSC) rider as set out in this order.

This order incorporates the Commission's interim order issued in this docket on June 12, 2012 and the Commission's rulings adopting in part and rejecting in part the stipulation and settlement agreement filed by ETI, Texas Industrial Energy Consumers (TIEC), and Commission Staff on May 17, 2013.  The interim order addressed the Commission's decision regarding three threshold issues surrounding ETI's CGS program.  The May 17 settlement, as adopted in part and rejected in part, resolves all other contested issues in this docket.

### II. Procedural History

ETI submitted its proposed CGS tariff and related riders in Docket No. 37744, its last rate case.[1]  In that rate case, the parties settled on all issues except for ETI's CGS proposal.  After a hearing on the CGS proposal and the associated riders, the administrative law judge (ALJ) forwarded the parties' stipulation and settlement agreement and the proposal for decision to the Commission for consideration.

---

[1] *Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs,* Docket No. 37744, Corrected Application (Feb. 23, 2010).

The Commission considered the settlement and the proposal for decision at the November 10 and December 1, 2010 open meetings. The Commission adopted the settlement for the rate case issues and severed the CGS issues into this docket, including the record in Docket No. 37744.[2]

At the December 1, 2010 open meeting, the Commission requested the parties to enter into negotiations and work to come to agreement on as many of the undetermined CGS program issues as possible, and then bring the issues for which an agreement could not be reached back to the Commission for consideration. Status reports were filed on January 13 and 28, February 18, March 11, and April 8, 2011. These reports indicated that parties continued to negotiate and that they were working to narrow the contested issues.

On September 8, 2011, State Agencies, Cities, OPUC, Kroger, and Wal-Mart jointly filed a motion requesting a decision on the proposal for decision in this docket. TIEC and Commission Staff filed responses to the joint motion and generally opposed the motion. At its September 29, 2011 open meeting, the Commissioners considered the motions and issued an order requiring the parties to file pleadings identifying the CGS tariff issues that have been settled on by the parties and identifying the issues for which a settlement could not be reached. The parties were also permitted to identify issues that are contingent upon the Commission's determination of the unsettled issues.

On November 1, 2011, several parties[3] filed an agreed list of settled issues. However, the parties did not agree on a recommendation as to how the unsettled issues and issues that are contingent on the Commission's determination of unsettled issues should be addressed and resolved by the Commission. Therefore, TIEC also separately filed a list of unsettled issues and request for procedural schedule. TIEC also requested that the Commission receive additional evidence in order to resolve the unrecovered costs issue because ETI's proposal in Docket No. 37744 was based on ETI's proposal for an energy-only program, not an energy and capacity-based program. TIEC reported that during the time period when the parties were

---

[2] *Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs*, Docket No. 37744, Order No. 14 Memorializing Decision Granting Motion to Sever (Dec. 3, 2010).

[3] Cities, Entergy, OPUC, Commission Staff, State Agencies, and Wal-Mart/Sam's East. Kroger Company did not oppose the agreed settled issues and Cottonwood Energy has not participated in the discussions.

negotiating, the Entergy Operating Committee had agreed that CGS power from qualifying facilities in the ETI service territory could provide firm generation.[4]

At the December 8 and December 15, 2011 open meetings, the Commission decided that the parties should submit stipulated facts, the Commission would re-open the record to admit additional evidence, and then the Commission would make a decision on the unsettled issues. After that, the Commission planned to issue an interim order reflecting the decisions on the unsettled, threshold issues.

On January 20, 2012, the parties submitted agreed settlement terms and stipulated facts. The parties reached agreement in principle on a number of discrete items within the overall framework of the CGS program and tariffs. Many of the items were simply elements of larger program issues that retained, at that time, one or more unsettled aspects essential to final resolution of that program issue. Items as to which there was agreement in principle were "subject to satisfactory resolution of unsettled issues."[5]

On January 26, 2012, ETI submitted supplemental direct testimony. On February 10, 2012, the intervenors submitted supplemental direct testimony and on February 25, 2012, ETI and intervenors submitted rebuttal and cross rebuttal testimony. The parties submitted statements of position and pre-hearing briefs on March 26, 2012.

On April 13, 2012, the parties submitted an unopposed stipulation on the threshold issue regarding customers responsible for paying unrecovered costs. The parties, except ETI, agreed that CGS customers would be the only ETI customers responsible for unrecovered costs of the CGS program. ETI did not join or oppose this stipulation.[6] On April 18, 2012, the parties submitted a third stipulation on customer eligibility stating that large industrial power service (LIPS) customers would be the CGS-eligible customers, with certain limitations on the LIPS customers' participation and other program minimums and caps.[7]

The Commission held a hearing on the remaining contested threshold issue—what types of costs will be considered unrecovered for purposes of PURA § 39.452(b)—on April 19, 2012.

---

[4] TIEC's Response to Joint Motion for Decision on Proposal for Decision at 4 (Sep. 15, 2011).

[5] CGS Stipulated Matters and Stipulated Facts (Jan. 20, 2012).

[6] Unopposed Stipulation on Unresolved Issue No. 3 (Apr. 13, 2012).

[7] Stipulation on Unresolved Issue No. 2 (Apr. 18, 2012).

An interim order was issued on June 12, 2012. It was expected that the parties would reach agreement on the remaining issues.

On November 27, 2012, TIEC filed a motion to adopt a CGS program and submitted proposed CGS riders for approval. TIEC and ETI had not been able to resolve certain issues related to the CGS tariffs and TIEC stated that continued negotiations would only result in further delay of the implementation of the CGS program.[8] Commission Staff requested that the parties be required to submit a procedural schedule to govern the handling of the docket.[9] ETI submitted its own version of the CGS tariffs for approval and proposed procedures to lead to final disposition of this docket.[10]

The Commission ALJ issued Order No. 10 adopting a procedural schedule that required the parties to indicate by February 8, 2013 whether a hearing was necessary. TIEC filed a letter stating that no party intended to file a request for a live hearing to cross-examine witnesses on the remaining contested issues.[11] Cities, OPUC, ETI, TIEC, and Commission Staff filed briefs on March 1, 2013 and reply briefs on March 20, 2013. At the April 25, 2013 open meeting, the parties gave oral argument and the Commissioners discussed the Entergy Operating Committee review of the capacity component of the CGS program and the proposed MISO regulatory change provision. The Commission deferred its ultimate decision on all of the issues to the May 9, 2013 open meeting.

On May 8, 2013, TIEC filed a letter stating that TIEC and ETI had reached a preliminary agreement on the remaining disputed issues, but that the other parties had not had an opportunity to review the agreement.[12] At the May 9 open meeting, the Commission deferred consideration of the docket until the May 23, 2013 open meeting.

ETI filed a stipulation and settlement agreement on May 17, 2013 that addressed each of the disputed issues that remained in this case. ETI, TIEC, and Commission Staff signed the

---

[8] TIEC's Motion to Adopt a Competitive Generation Services Program (Nov. 27, 2012).

[9] Commission Staff's Response to TIEC's Motion to Adopt a Competitive Generation Services Program (Dec 4, 2012).

[10] Entergy's Response to TIEC's Motion to Adopt Competitive Generation Services Program and Motion for Adoption of Competitive Generation Services Tariffs at 1-2 (Dec. 4, 2012).

[11] Letter from TIEC (Feb. 8, 2013).

[12] Letter from TIEC (May 8, 2013).

stipulation. The stipulation and settlement agreement included agreement on all of the issues regarding the CGS rider, *i.e.*, how the CGS program would work, but delayed approval of the competitive generation service cost (CGSC) rider, which is the rider that will include implementation and administration costs for the CGS program, for a later date.

Specifically, the signatories to the settlement agreed that the CGSC rider would not be proposed for approval, but would be filed with the Commission no earlier than six months after the CGS rider becomes effective. The parties also stipulated to five issues that would be addressed in the CGSC rider docket. ETI noted that Commission Staff supports the stipulation, but did not take a position relating to the deferral of the consideration of issues regarding the CGSC rider.[13] OPUC, joined by Kroger Company, Wal-Mart Stores, LLC, and Sam's East, Inc. filed a statement of opposition to the stipulation stating that their opposition was limited to Section II.B. of the stipulation, which allows the delay of the resolution of the CGSC rider issues.[14] Cities filed a letter on May 21 stating that it supports the resolution of the issues in the stipulation, but that they also support resolving all issues at this time in order to conserve judicial resources and provide certainty to parties in future cases.[15] TIEC filed a response to the opposition[16] and OPUC, Kroger, Wal-Mart, and Sam's East filed a reply to TIEC's response.[17]

The Commission considered this docket again on the merits at the May 23, 2013 open meeting. The Commission adopts the May 17, 2013 stipulation and settlement agreement in part, but rejects the deferral of approval of the CGSC rider set out in section II.B.2. of the stipulation. The Commission adopts the stipulation and settlement agreement as it pertains to the CGS rider, and makes findings on the outstanding issues related to the CGSC rider.

---

[13] Stipulation and Settlement Agreement (May 17, 2013).

[14] Joint Statement of Position (May 17, 2013).

[15] Cities' Letter Addressing the Settlement Reached by Entergy and TIEC (May 21, 2013).

[16] TIEC's Response to OPUC's Statement of Opposition (May 21, 2013).

[17] Joint Reply to TIEC's Response to the Joint Statement of Opposition (May 22, 2013).

### III. Discussion

PURA[18] § 39.452(b) requires ETI to propose a CGS tariff that would require ETI to purchase CGS, selected by the CGS customer, and provide the generation at retail to the customer. ETI is required to provide and price retail transmission service, including necessary ancillary services, to retail customers who choose to take advantage of the competitive generation tariff at a rate that is unbundled from the utility's cost of service. Competitive generation customers are not to be considered wholesale transmission customers. The statute required the Commission to approve, reject, or modify the proposed tariff not later than September 1, 2010. The CGS tariff may not be considered to offer a discounted rate or rates under Section 36.007, and ETI's rates shall be set, in the proceeding in which the tariff is adopted, to recover any costs unrecovered as a result of the implementation of the tariff. The statute requires the Commission to ensure that a competitive generation tariff not be implemented in a manner that harms the sustainability or competitiveness of manufacturers that choose not to take advantage of competitive generation. PURA § 39.452(b) also prohibits the Commission from issuing a decision relating to the competitive generation tariff that is contrary to an applicable decision, rule, or policy statement of a federal regulatory agency having jurisdiction.

The Commission finds that the three stipulation and settlement agreements submitted by the parties in January and April 2012 are reasonable and adopts them to the extent they do not conflict with other Commission determinations in this docket.

The Commission also finds that unrecovered costs are only those costs necessary to implement and administer the CGS program and are not to be defined to include lost revenues, embedded generation costs, or any other types of costs.

Finally, the Commission finds that the May 17, 2013 stipulation with regard to the CGS rider is reasonable and adopts that portion of the stipulation. The Commission declines to adopt the stipulation regarding the CGSC rider, and finds that the issues regarding the CGSC rider should not be deferred and that the CGSC rider should not include costs prior to implementation of the CGS program; LIPS and LIPS time-of-day customers should be responsible for the CGSC

---

[18] Public Utility Regulatory Act (PURA), TEX. UTIL. CODE ANN. §§ 11.001-66.017 (Vernon 2007 & Supp. 2011).

rider costs if the CGS program is unsubscribed; ETI should not recover interest on any unrecovered balance of the CGSC rider; and the CGSC rider costs should not be offset to account for the CGS costs included in ETI's base rates.

## A. Unrecovered Costs

As explained in the interim order, the meaning of "costs unrecovered as a result of implementation of the CGS program tariff," as used in PURA § 39.452(b), was the subject of the April 19, 2012 hearing. In the proposal for decision, the ALJ found that ETI is entitled to collect unrecovered embedded generation costs and any other related base rate costs as a result of customer migration to the CGS program.[19]

ETI argued that unrecovered costs should be defined as the embedded production costs and any other related base rate costs that would have been recovered through traditional rates charged to CGS customers that will no longer be recovered due to the CGS program.[20] TIEC took the position that unrecovered costs should not include ETI's hypothetical lost revenues and that the costs that could be unrecovered as a result of implementation of the tariff should include the expenditures actually incurred by ETI to implement and maintain the CGS program.[21] Cities and OPUC agreed with TIEC that unrecovered costs are not the same thing as unrecovered revenues.[22] Cities also noted that it would be unreasonable to allow ETI to continue to incur costs for a customer the utility no longer plans to serve.[23]

In making its determination of the definition of unrecovered costs, the Commission follows the precedent set in *CenterPoint Energy Houston Electric, LLC v. Pub. Util. Comm'n*, 354 S.W.3d 899 (Tex. App—Austin, 2011 no pet.) where the Third Court of Appeals found that because the language of PURA § 39.905 did not specifically provide for recovery of "lost revenues" and that in at least two other provisions of PURA[24] the legislature expressly

---

[19] Proposal for Decision at 22 (Oct. 5, 2010).

[20] Supplemental Direct Testimony, Exhibits, and Workpapers of Phillip R. May, ETI Ex. 91 at 6.

[21] Supplemental Direct Testimony of Jeffry Pollock, TIEC Ex. 15 at 14-15.

[22] Supplemental Direct Testimony of Karl Nalepa, Cities Ex. 6C at 7 and Supplemental Cross Rebuttal Testimony of Clarence Johnson, OPUC Ex. 8 at 6.

[23] Supplemental Direct Testimony of Karl Nalepa, Cities Ex. 6C at 7-8.

[24] PURA § 55.024(b) and PURA § 56.025(e).

distinguishes "costs" from "revenues," the term "costs," as used by the legislature in PURA § 39.905, is not intended to include lost revenues.[25] Like PURA § 39.905, PURA § 39.452(b) only provides for "costs unrecovered as a result of implementation of the tariff" and does not specifically provide for the utility to recover lost revenues or any other type of costs.

Based on the evidence and testimony, the Commission finds that the proper interpretation of "costs unrecovered as a result of implementation of the CGS program tariff" is costs to implement and administer the CGS program tariff. Such unrecovered costs do not include lost revenues, embedded generation costs, or any other types of costs. The Commission reverses the proposal for decision on this issue.

### B. May 17, 2013 Stipulation and Settlement Agreement

The Commission adopts the May 17, 2013 stipulation and settlement agreement in part, and rejects the settlement in part.

Under the terms of the stipulation, the parties agreed on issues relating to a CGS credit amount, a fixed cost contribution fee, unserved energy, a termination payment, a force majeure clause, the Entergy Operating Committee, and MISO. Those issues are covered under findings of fact 53A-H. Under the stipulation, decisions regarding the CGS cost rider were to be deferred until no earlier than six months after the CGS rider became effective. The Commission adopts the stipulation except for the portion of the stipulation that would defer decisions regarding the CGS cost rider. The Commission elects to make those decisions now rather than deferring them, and no party at the open meeting objected to this proposal.

### C. CGSC rider

1. Retroactive Recovery of Historical Costs

ETI proposed to recover the costs it incurred since November 10, 2010 related to the CGS program.[26] TIEC's version of the CGSC rider would permit ETI to be able to recover the incremental, reasonable, and necessary CGS program implementation and administration costs

---

[25] *CenterPoint Energy Houston Electric, LLC v. Pub. Util. Comm'n*, 354 S.W.3d 899, 903-904 (Tex.Civ.App—Austin, 2011)

[26] ETI's redlined tariff version Exhibit DRR-SD-6 at 1, Section II Purpose.

incurred by ETI following the approval of the CGS program pursuant to PURA § 39.452(b).[27] Commission Staff did not support allowing ETI to recover costs in excess of the amounts already in base rates until the CGS program is actually implemented and the implementation costs associated with the eventual design of the CGS program are actually incurred.[28] The Commission finds that ETI should not be able to recover any costs via the CGSC rider until the CGS program is implemented.

2. Cost Recovery if the CGS program is unsubscribed

ETI proposed that if the CGS program is unsubscribed, the CGSC rider rate would apply to the classes that are eligible to participate in the program.[29] Commission Staff agreed with ETI and noted that even if the costs incurred to implement the program are *de minimis* because there are no subscribers, ETI would still be entitled to recover those costs under PURA § 39.452(b).[30] OPUC agreed with ETI and Commission Staff.[31] TIEC urged the Commission to defer this issue until the facts are not speculative in order to balance the twin charges of the statute of allowing ETI to recover any costs that are unrecovered as a result of the implementation of the tariff and ensuring that the tariff is not implemented in a manner that harms the sustainability or competitiveness of manufacturers that choose not to take advantage of the CGS program.[32]

The Commission finds that ETI should be allowed to recover CGSC rider costs in the event that there are no subscribers to the CGS program, because PURA § 39.452(b) entitles ETI to recover those costs. The Commission finds that those costs should be borne by the customer class that the program was designed to benefit—the LIPS and LIPS-TOD customers—the customers that are eligible to participate in the program. The Commission adopts the language proposed by ETI on this issue in Section III of the redlined tariff.

---

[27] TIEC's Initial Brief at 21-24.

[28] Commission Staff's Initial Brief at 6-7 (March 1, 2013).

[29] ETI's redlined tariff version Exhibit DRR-SD-6 at 1, Section III Rate.

[30] Commission Staff's Initial Brief at 7 (March 1, 2013).

[31] OPUC's Reply Brief at 12 (March 20, 2013).

[32] TIEC's Initial Brief at 24-25 (March 1, 2013).

3. Interest

Citing PURA § 39.452(b), that ETI should be allowed to recover any costs unrecovered as a result of implementing the tariff, ETI requested recovery of interest on the unrecovered balance of the CGSC rider charges.[33] TIEC noted that the CGSC rider would be periodically adjusted to reflect ETI's actually incurred costs, so there would be no need for ETI to accrue interest on any unrecovered balance.

The Commission finds that not allowing interest would be consistent with the treatment of rate-case expenses, which are typically amortized over a three-year period without a return on the unamortized balance.[34] ETI should not be permitted to recover interest on the unrecovered balance of the CGSC rider charges.

4. CGSC rider costs recovered in rate-base offset

OPUC argued that the interim order is clear that the costs to implement the CGS program are to be borne only by CGS customers. However, $299,372 was included in ETI's base rates for costs related to the CGS program and will be paid by all retail customer classes. OPUC recommended that the same amount that is being recovered from all retail customers in base rates for CGS costs be recovered solely through the CGSC rider. Since the LIPS class is being charged $49,192 per year in base rates, OPUC recommended that the CGS rider should be reduced by $49,192 to prevent double-recovery and that the remainder that is being recovered in retail base rates, $249,960, should be refunded directly to each class in the amount allocated in base rates.[35]

TIEC took the position that OPUC was attempting make a collateral attack on the Commission's order in ETI's rate case. Furthermore, TIEC argues that ETI should not be required to conduct OPUC's proposed "offset" for the same reason that ETI should not be permitted to include costs incurred since November 2010—the costs are not costs to implement the CGS program.[36]

---

[33] ETI's Initial Brief at 24 (March 1, 2013).

[34] TIEC's Initial Brief at 25 (March 1, 2013).

[35] OPUC's Initial Brief at 3-7 (March 1, 2013).

[36] TIEC's Reply Brief at 17-18 (March 20, 2013).

ETI proposed to credit the CGSC rider with $299,372 to recognize amounts that were used in setting ETI's current base rates. This amount represents the amount of CGS-related costs that ETI is already recovering in base rates pursuant to the Commission's order in ETI's most-recent rate case, Docket No. 39896.[37]

The Commission agrees with TIEC on this issue and goes further to state that to permit an offset to the CGSC rider for amounts already included in rates may be retroactive ratemaking.

5.      Amount to be recovered in the CGSC rider

The Commission does not reach the issue of the amount to be recovered for the implementation and administration costs at this time because the amount cannot be known until ETI actually implements the program.

## IV.    Conclusion

The Commission adopts each of the stipulation and settlement agreements except for section II.B.2 of the May 17, 2013 stipulation, and finds that unrecovered costs for the CGS program are those needed to implement and administer the CGS program and are not lost revenues, embedded generation costs, or any other types of costs. The Commission finds that ETI should not be able to recover any costs via the CGSC rider until the CGS program is implemented, that ETI should be allowed to recovery CGSC rider costs in the event that there are no subscribers to the CGS program, that ETI should not be permitted to recover interest on the unrecovered balance of the CGSC rider charges, and that ETI should not be required to conduct OPUC's proposed "offset."

---

[37] *Application of Entergy Texas, Inc. for Authority to Change Rates, Reconcile Fuel Costs, and Obtain Deferred Accounting Treatment*, Docket No. 39896, Order (Sept. 14, 2012).

## V. Findings of Fact

*Procedural History*

1. As part of its application in Docket No. 37744, *Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs*, ETI proposed a competitive generation service (CGS) program pursuant to Public Utility Regulatory Act. Tex. Util. Code Ann. (PURA) § 39.452(b).

2. On July 16, 2010 and July 20, 2010, a State Office of Administrative Hearings administrative law judge held a hearing on the merits on ETI's CGS proposal.

3. A proposal for decision was issued on November 1, 2010. The ALJ ultimately recommended that the CGS proposal be rejected.

4. The Commission considered the proposal for decision at the November 10 and December 1, 2010 open meetings as part of docket No. 37744. At the December 1, 2010 open meeting, the Commission adopted the settlement for the rate case issues and severed the CGS proposal into this Docket. The Commission requested that the parties enter into negotiations and work to come to agreement on as many of the undetermined issues as possible, and then bring the issues for which an agreement could not be reached back to the Commission for consideration.

5. Order No. 1 was issued on December 3, 2010 severing the CGS issues into this docket, including the record in Docket No. 37744.

6. Sabine Cogen, LP filed a motion to intervene in this docket on December 23, 2010. ETI filed an objection to Sabine Cogen, LP's motion to intervene on December 30, 2010. Sabine Cogen, LP's motion to intervene was denied in Order No. 3 on January 12, 2011.

7. ETI, Commission Staff, Office of Public Utility Counsel, Texas Industrial Energy Consumers, State Agencies, Kroger Co., Cities,[38] Wal-Mart Stores Texas, LLC and Sam's East, Inc., and Cottonwood Energy are parties to this proceeding.

---

[38] The cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Pinehurst, Port Arthur, Port Neches, Rose City, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange.

8. On January 11, 2011, the Commission ALJ issued Order No. 2 requiring ETI to either provide an update on the status of settlement discussions or to propose a schedule, agreed to by all parties, for finalizing the outstanding issues.

9. The parties filed status reports on January 13 and 28, February 18, March 11, and April 8, 2011. These reports indicated that parties continued to negotiate and that they thought that they could narrow the issues.

10. On September 8, 2011, State Agencies, Cities, OPUC, Kroger, and Wal-Mart jointly filed a motion requesting a decision on the proposal for decision in this docket. TIEC and Commission Staff filed responses to the joint motion and generally opposed the motion. At the September 29, 2011 open meeting, the Commissioners considered the motions and issued an order requiring the parties to file pleadings identifying the CGS tariff issues that have been settled on by the parties and identifying the issues for which a settlement could not be reached. The parties were also permitted to identify issues that are contingent upon the Commission's determination of the unsettled issues.

11. On November 1, several parties filed an agreed list of settled issues. TIEC also separately filed a list of unsettled issues and request for procedural schedule. TIEC also requested that the Commission receive additional evidence in order to resolve the unrecovered costs issues because ETI's proposal in Docket No. 37744 was based on ETI's proposal for an energy-only program, not an energy and capacity-based program. The circumstances had changed primarily due to the agreement of the Entergy Operating Committee to treat CGS power from qualifying facilities in the ETI service territory as firm generation. The remainder of the parties filed a joint agreed list of unsettled issues and issues contingent on a Commission determination of unsettled issues.

12. At the December 8 and December 15, 2011 open meetings, the Commissioners decided that the parties should submit stipulated facts, the Commission would re-open the record to admit additional evidence as requested by TIEC, and then the Commission would make a decision on the three threshold unsettled issues in an interim order.

13. On December 18, 2011, Order No. 4 was issued establishing a procedural schedule.

14. On January 20, 2012, the parties submitted agreed settlement terms and stipulated facts. The parties reached agreement in principle on a number of discrete items within the overall framework of the CGS program and tariffs. Many of the items were simply elements of larger program issues that retain one or more as yet unsettled aspects essential to final resolution of that program issue. Items as to which agreement in principle existed were "subject to satisfactory resolution of unsettled issues."

15. On January 24, 2012, Order No. 5 was issued clarifying the number of copies of testimony that were to be filed by the parties.

16. On January 26, 2012, ETI submitted supplemental direct testimony. On February 10, 2012, the intervenors submitted supplemental direct testimony and on February 25, 2012, ETI and intervenors submitted rebuttal and cross rebuttal testimony. The parties submitted statements of position and pre-hearing briefs on March 26, 2012.

17. Order No. 6 was issued on February 1, 2012 setting April 19, 2012 as the date for the hearing.

18. On April 13, 2012, the parties filed an unopposed stipulation that to the extent there are costs unrecovered as a result of the implementation of a CGS tariff, those costs should be borne solely by customers taking service under the CGS tariff. ETI did not join but did not oppose the stipulation.

19. On April 18, 2012, the parties filed an unopposed stipulation regarding customer eligibility. LIPS customers will be eligible to participate in ETI's CGS program (with further limitations as set forth in the stipulation on this issue).

20. The Commission held the hearing on the merits on April 19, 2012, and issued an interim order on June 12, 2012 that adopted the unopposed issues and ruled that the types of costs that will be considered ETI's unrecovered costs for purposes of PURA § 39.452(b) are those costs necessary to implement and administer the CGS program and are not to be defined to include lost revenues, embedded generation costs, or any other types of costs.

21. Subsequent to the interim order, the parties continued discussions regarding how to develop a CGS tariff (or tariffs) that would conform to the interim order rulings and resolve other remaining contested issues.

22. On November 27, 2012, TIEC filed a motion to adopt a competitive generation services program that included its proposed Rider Schedule CGS and Rider Schedule CGSC, the latter of which addressed ETI's recovery of its costs of implementing and administering the CGS program. TIEC's motion also addressed a number of issues that the parties had not been able to resolve, and asked that the Commission rule in TIEC's favor on those remaining contested issues.

23. On December 4, 2012, ETI filed a response to TIEC's November 27 motion. ETI's response addressed the same contested issues raised by TIEC and asked the Commission to rule in favor of ETI's position. ETI's response also included its own versions of the CGS and CGSC riders (based on its positions on the contested issues), plus a redlined version of both riders that compared TIEC's versions to ETI's versions.

24. On January 7, 2013, in response to a motion filed by TIEC, the Commission issued a procedural schedule that required parties to file supplemental testimony in support of their positions later in January and early February, and that parties were to indicate, on February 8, 2013, whether a hearing was necessary. Interested parties filed supplemental testimony in accordance with that schedule, and no party requested an evidentiary hearing.

25. On February 19, 2013, the Commission issued an agreed briefing schedule which called for parties to file a joint motion to stipulate testimony and RFIs into the record on February 25, and for parties to file initial and reply briefs on March 1 and 20, respectively, which briefs were filed by ETI, TIEC, Staff, OPUC, and Cities.

26. On May 8, 2013, TIEC filed a letter stating that TIEC and ETI had reached a preliminary agreement on the remaining disputed issues and asked that this matter be deferred to the next open meeting. All parties indicated their agreement with the deferral. The Commission deferred consideration until the May 23, 2013 open meeting.

27. On May 17, 2013, ETI filed a stipulation and settlement agreement, which was supported by TIEC and Staff, but with Staff taking no position on Sections II.B.1 and 2 of that settlement.

28. On May 17, 2013, OPUC, Kroger, and Wal-Mart filed a Joint Statement of Opposition to the May 17 settlement. Their opposition was limited to Section II.B. of that settlement and pertained to the proposed delay in deciding certain issues before the Commission, including which customer classes should pay for costs recovered through the CGSC rider in the event there are no CGS program subscribers, and the treatment of CGS project code costs "embedded" in ETI's base rates in accordance with the Commission's order in Docket No. 39896.

29. TIEC filed a response to the Joint Statement of Opposition on May 21, 2013.

30. OPUC, Kroger and Wal-Mart filed a joint reply to TIEC's response on May 22, 2013.

31. The Commission considered this matter at its May 23, 2013 open meeting, at which it voted to accept in part and reject in part the May 17 settlement.

### *Eligible customers stipulation*

32. The parties agreed that only customers eligible to take service under ETI's Large Industrial Power Service (LIPS) are eligible customers for the CGS program.

33. The parties agreed that only LIPS firm load will be eligible to participate in the CGS program.

34. The parties agreed that LIPS customers with interruptible service (IS) or standby and maintenance service (SMS) load are not precluded from participating in the CGS program, but this participation is limited to their firm LIPS load. To the extent that customers with IS load participate in the CGS program, they must comply with the terms of the IS tariffs regarding minimum LIPS load. Only the portion of the customer's LIPS load that is in excess of the firm contract power minimum requirement under section 1 of Schedule IS is eligible for the CGS program.

35. The parties agreed that to the extent there are increased administration costs associated with billing a customer that has CGS and IS or SMS load, the CGS customer will bear the costs.

36. The parties agreed that there will be a 115 MW cap on the CGS program.

37. The parties agreed that there will be a 5 MW minimum on CGS customer load.

38. The parties agreed that there will be no aggregation of CGS customer load to meet the 5 MW minimum on CGS customer load.

39. The parties agreed that there will be a cap of 10 CGS purchase agreements.

*Customers responsible for paying unrecovered costs stipulation*

40. The parties, except ETI, agreed that to the extent there are costs unrecovered as a result of the implementation of a CGS tariff, those costs should be borne solely by customers taking service under the CGS tariff, *i.e.,* CGS customers. ETI did not oppose this stipulation.

*January 20, 2012 CGS Stipulated Matters and Stipulated Facts*

41. In the CGS stipulated matters and stipulated facts filed on January 20, 2012, the parties stated they had reached an agreement in principle on a number of discrete items within the overall framework of the CGS program and tariffs, which were listed in Section I. A-G of the stipulation. However, many of those items were simply elements of larger program issues that retained one or more unsettled aspects essential to final resolution of that program issue. Items as to which agreement in principle existed, subject to satisfactory resolution of unsettled issues, included the following:

A. Eligible CGS suppliers

1. Eligible CGS suppliers will be limited to qualifying facilities that are or will be directly connected to ETI. Any expansion of eligible CGS suppliers would require initiation of new Commission proceedings.

B. Amount of CGS capacity

1. A CGS customer will specify the amount of its load to be served by a specified CGS supplier.

2. The specified CGS supplier will enter into a contract with Entergy Services, Inc., on behalf of ETI, or directly with ETI, for the purpose of becoming an Entergy system network resource. The agreement between the CGS supplier and Entergy Services, Inc. or ETI shall include a contract for the purchase of capacity and energy (CGS purchase agreement). Per determination of the Entergy Operating Committee, the

capacity and energy contracted for under the CGS purchase agreements shall be allocated solely to ETI.

3. The level of capacity contracted for under the CGS purchase agreement (CGS contract capacity) will be the same level of capacity contracted for in a separate but related contract between the CGS supplier and the CGS customer.

4. The monthly CGS supplied capacity shall be calculated monthly based on the on-peak energy deliveries of CGS-supplied energy from the CGS supplier. The monthly CGS supplied capacity shall be the lesser of the CGS contract capacity and the result of the following calculation—on a rolling 12-month basis (using a cumulative basis during the first 11 months), the sum of the CGS-supplied energy delivered by the CGS supplier during on-peak hours, divided by the number of on-peak hours during the same time period, divided by 0.8. On-peak hours are defined as the hours ending 7:00 am through 10:00 pm Monday through Saturday, excluding North American Electric Reliability Corporation holidays.

C. CGS-customer unbundled rate

1. CGS customers are limited to, and will remain, ETI retail customers.

2. ETI will not make a capacity payment to the CGS supplier, and the CGS customer will not pay ETI the embedded production cost in the firm rate schedule under which the customer would otherwise be eligible to receive service.

3. The price for retail delivery service, including necessary ancillary services, to retail customers who choose to take advantage of the competitive generation tariff will be a rate that is unbundled from ETI's cost of service and that will be determined by a credit to the CGS customer's bill based on the unbundled production costs associated with the otherwise applicable firm rate.

4. The unbundled, embedded production cost for a LIPS customer based on current rates is $6.84 per kW per month.[39] The CGS credit is subject to review and modification in subsequent rate cases. If the clause "less any corresponding concurrent

---

[39] The parties subsequently agreed to set this amount at $6.50 per kW per month until rates are changed in ETI's next base rate case (that is, the next base rate case after May 16, 2013). Finding of Fact No. 53A.

reduction in energy purchased by the CGS customer" referenced in section F.1 below is adopted, then certain parties may recommend a further adjustment to the LIPS embedded production cost specified in this paragraph C.4.

5. With the exception of the capacity credit and fixed fuel factor, a CGS customer will pay ETI a retail rate that includes all other charges the customer would pay as a firm customer (for example Rider TTC, HRC, SRC, SRO, and IFF charges, if applicable).

D. CGS energy payment

1. CGS customers will pay fuel costs based on avoided cost for CGS-supplied energy. Specifically, ETI will purchase hourly CGS energy supplied by the CGS supplier from the CGS contract capacity at the system hourly avoided-energy-cost as determined under Rate Schedule LQF. ETI will charge the CGS customer at the same rate for that hourly CGS-supplied energy not to exceed the energy requirement of the CGS customer.

E. CGS customer fixed-cost contribution

1. The level of compensation to ETI from CGS customers for CGS service will include a monthly fixed charge called a fixed-cost contribution.

2. The fixed-cost contribution will be $1.10 per kW of CGS load per month.

3. Revenues from the fixed-cost contribution will reduce any otherwise unrecovered costs associated with the program.

F. CGS customer unserved energy rate

1. If, in any hour in a delivery month, there is hourly CGS unserved energy, the CGS customer will take service from ETI under the CGS unserved energy rate. Hourly CGS unserved energy is the difference in any given hour between the amount of energy corresponding to the full amount of CGS contract capacity and the amount of energy actually supplied to ETI from the CGS contract capacity by the CGS supplier in such hour, not to exceed the energy requirement of the CGS customer. The parties have

not agreed whether the following clause should be added to this last sentence: "less any corresponding concurrent reduction in energy purchased by the CGS customer."[40]

2. The structure of the CGS unserved energy tariffed rate will include an agreed energy charge and agreed O&M adder. The monthly CGS unserved energy charge will be the sum of (a) the hourly CGS unserved energy for the month times 105% of the system hourly avoided energy cost as determined under Rate Schedule LQF and (b) the hourly CGS unserved energy for the month times specified variable O&M charges specified immediately below in paragraph 3.

3. The specified variable O&M charges for the CGS unserved energy rate are as follows:

| Delivery Voltage | On-Peak Per kWh | Off-Peak Per kWh |
|---|---|---|
| Distribution (less than 69kV) | $0.03555 | 0.00540 |
| Transmission (69kV and greater) | $0.02451 | 0.00222 |

4. On-peak and off-peak hours for the CGS unserved energy rate are as follows:

a. Summer: On-peak hours are 1:00 pm to 9:00 pm Monday through Friday of each week beginning on May 15 and continuing through October 15 of each year except that Memorial Day, Labor Day and Independence Day (July 4 or the nearest weekday if July 4 is on a weekend) are not on-peak.

b. Winter: On-peak hours for each week of Monday through Friday beginning October 16 and continuing through May 14 of each year are 6:00 am to 10:00 am and 6:00 pm to 10:00 pm, except that Thanksgiving Day, Christmas Day, and New Year's Day (or the nearest weekday if the holiday should fall on a weekend) are not on-peak.

---

[40] The parties subsequently agreed that this quoted language would be added.

c.      Off-peak hours are all hours of the year not specified as on-peak hours. With the approval of the Commission, ETI may at its sole discretion change on-peak hours and season from time to time.

5.      Revenues from the CGS unserved energy rate derived from the variable O&M charges will go towards offsetting any unrecovered costs as a result of the implementation of the CGS tariff.

6.      Revenues from the CGS unserved energy rate derived from 105% of the system hourly avoided energy charges will go towards offsetting ETI's eligible fuel costs.

G.      Recognition of CGS supply as firm capacity. Progress has been made on resolving issues regarding the recognition of CGS capacity as firm capacity, but final resolution of these issues, including the following, is contingent on the Entergy Operating Committee's approval as well as a final resolution of all issues.

1.      The Entergy Operating Committee has established certain conditions that must be met before it will recognize a CGS purchase agreement as "capability" for the Entergy System, for purposes of determining reserve equalization payments or receipts. The parties are continuing to discuss the conditions established by the Operating Committee.

2.      The capacity product from CGS purchase agreements will be a 24/7 unit-contingent product.

3.      The delivery term of CGS purchase agreements may be from one year to five years, and must be a whole number of years.

4.      The contract capacity will be a fixed capacity amount throughout any successive 12-month period during the contract term.

5.      The parties have tentatively agreed to a number of concepts for firming up CGS capacity that would be reflected in a form contract for use in implementing the CGS program. The parties will continue to negotiate other concepts and terms for inclusion in a form supply contract.

42.      The parties stipulated that the Strategic Resource Plan (SRP) for the Entergy system (of which ETI is a part) projects a continuing need for additional capacity for ETI and the

Entergy system through 2017. Entergy's and ETI's resource needs are subject to change at any time based on actual experience related to operational conditions, resource offers and solicitations, and other events that affect resource needs.

43. The parties stipulated that based on an assessment of load requirements and generating capability, the SRP projects that ETI has an incremental net resource deficiency of 260 MW in 2012 and 504 MW in 2013.

44. The parties stipulated that the Entergy system-wide planning process is conducted pursuant to the requirements of the Entergy system agreement and is designed to result in a portfolio of resources that differ by term and source. The Entergy system agreement states that the objective of this process is to ensure cost-effective, reliable levels of service.

45. The parties stipulated that CGS purchase agreements are resources that will be included in the Entergy System's portfolio of supply resources, consistent with the terms and conditions related to the delivery requirements of those purchase agreements (*e.g.,* degree of dispatchability, term, degree of firmness).

46. The parties stipulated that it is reasonable at the outset of the CGS program to establish a cap on the amount of load that may subscribe to CGS service.

47. The parties stipulated that the range of the cap should be between 80 MW and 150 MW.

48. It is reasonable to adopt the three unopposed 2012 stipulation and settlement agreements regarding customer eligibility for the CGS program; the customers responsible for paying for unrecovered costs; the capacity deficit; and the program cap.

### *Unrecovered costs*

49. PURA § 39.452(b) provides for the utility to be able to recover any costs unrecovered as a result of the implementation of the tariff.

50. In *CenterPoint*, the Third Court of Appeals found that because the language of PURA § 39.905 did not specifically provide for recovery of "lost revenues" and that in at least two other provisions of PURA the legislature expressly distinguishes "costs" from "revenues," the term "costs," as used by the legislature in PURA § 39.905, is not intended to include lost revenues. Like PURA § 39.905, PURA § 39.452(b) only

provides for "costs unrecovered as a result of implementation of the tariff" and does not specifically provide for the utility to recover lost revenues or any other type of costs.

51. The Commission finds that the costs that will be unrecovered as a result of the implementation of the CGS program tariff are the costs to implement and administer the CGS program tariff.

### The May 17, 2013 Stipulation and Settlement Agreement

52. The May 17 settlement addresses the remaining contested issues that were not resolved through the 2012 stipulation and settlement agreements and the interim order. The substantive provisions of the May 17 settlement address the CGS rider, the CGSC rider, and appeal rights.

53. Agreements as to CGS Rider:

A. CGS Credit: The parties agree to a CGS credit set at $6.50 per kW/month until rates are changed in ETI's next base rate case.

B. Unserved Energy: The parties agree to accept TIEC's proposed CGS rider tariff language in the Second Supplemental Direct Testimony of Jeffry Pollock, which will allow a CGS customer to attempt to decrease its load to match a decrease in deliveries by the CGS supplier and thereby avoid unserved energy charges to the extent the CGS customer's CGS load is reduced.

C. Termination Payment: The parties agree to remove ETI's proposed liquidated damages provisions from the CGS rider and deal with liquidated damages provisions in the supplier contract negotiations. The amount of liquidated damages, if any, received by ETI shall be used to offset any capacity costs incurred by ETI to replace the lost CGS supply.

D. The Tracking Certificate: The parties agree to remove ETI's proposed prioritization provisions in Section G(5) and H from the tracking certificate (leaving them to contract negotiations) and delete the provisions that would require the CGS customer to provide what TIEC deemed "competitively sensitive" information.

E. Force Majeure: The parties agree to remove TIEC's proposed force majeure provision.

F.      The Entergy Operating Committee: The parties agree to remove the following ETI-proposed "reservation" provision from the CGS rider:

> In addition, entering into new ETI-Supplier Contracts under the CGS Program (*i.e.,* ETI-Supplier Contracts that have not already been entered into by ETI in response to CGS Service requests) at any given time must be consistent with the Entergy System's need for capacity. Capacity resources associated with the CGS Program will receive no preferential treatment, but will be considered as part of the Entergy System's planning process on the same basis as other potential capacity resources. Recognition of the capacity component of the CGS Program on an ongoing basis is contingent on periodic Entergy Operating Committee conclusion that ETI requires the capability that would be obtained through this program component.

> ...

> ETI shall have the right by notice to the applicable customer, to deny or terminate a request for CGS Service at any time prior to entering into the ETI-Supplier Contract corresponding to such request if the limitations in the penultimate paragraph of § I above apply . . .

> ...

> The following clause in Rider CGS Section III.B.3 of ETI's proposed Rider CGS is modified as follows: Unless a CGS Service request is earlier denied or terminated according to tariff provisions (or provisions of law) applicable to the CGS Service . . .

G.      MISO: The parties agree that ETI's proposed RTO/MISO provision will stay in the CGS rider, but the phrase "it will be necessary or appropriate to include [MISO terms and conditions]" is changed to "it may be appropriate to include [MISO terms and conditions)."

H.      $1.10 Fixed Cost Contribution Fee: The parties agree that this fee will not be applied as an offset to CGS administration and implementation costs.

54.      Agreement as to CGSC Rider:

A.      ETI has agreed that an application for the CGSC rider will be filed with the Commission no earlier than six months after the CGS rider becomes effective.

B.      Section II.B.2. in the May 17, 2013 settlement was challenged by OPUC, Kroger, and Wal-Mart, with Cities also supporting resolution of the issues in Section II.B.2. now, rather than deferring them as proposed in the May 17, 2013 settlement.

C.      Other than Section II.B.2, no other sections of the May 17 settlement were opposed by OPUC, Kroger, Wal-Mart, or Cities, and were supported by ETI, TIEC, and Commission Staff. The Commission finds that those unopposed provisions in the May 17 settlement are reasonable and in the public interest.

D.      The record from the current CGS docket (Docket No. 38951) and from Docket No. 37744 shall be incorporated into the record in the CGSC rider application docket.

E.      All parties agree that only the variable O&M portion of the unserved energy rate should be used to offset the unrecovered implementation and administrative costs. Fuel-related revenues from the unserved energy rate will offset ETI's fuel balance, and not be used to offset unrecovered costs.

F.      There will be no changes to ETI's current base rates as a result of this proceeding.

55.      Agreement as to Appeal Rights: The parties agree that ETI is not waiving its right to appeal the Commission's final order to the courts on any issues that are not resolved by settlement in this docket. All parties reserve their rights under applicable state and federal law.

56.      Proposed CGS Program Tariff: The proposed CGS program tariff (the CGS rider), which is attached to the May 17 settlement as Attachment 1, is agreed to by the parties and represents the CGS program as set out in the preceding Findings of Fact.

57.      The Commission makes the following findings regarding the five issues within Section II.B.2. of the May 17 settlement:

A.      The appropriate date upon which ETI is authorized to begin accruing CGS program implementation and administration costs is the date that the CGS Rider implemented.

B.      In the event there are no subscribers to the CGS program, it is reasonable and appropriate for unrecovered implementation and administration costs accrued to the CGSC rider will be charged to the LIPS and LIPS-TOD customers, the customer class that the program was designed to benefit.

C.      It is not appropriate for ETI to recover interest on the unrecovered balance of the CGSC rider charges.

D.     It is not appropriate for there to be an offset to the CGSC rider for amounts included in rates in Docket No. 39896.

E.     The Commission declines to address at this time the amount to be recovered as implementation and administration costs because such amount is not known at this time.

## VI.     Conclusions of Law

1. The Commission has jurisdiction and authority over this proceeding pursuant to PURA §§ 14.001 and 39.452(b).

2. PURA § 39.452(b) does not allow for the recovery of lost revenue or embedded generation costs.

## VII.     Ordering Paragraphs

1. The Commission adopts each of the three stipulation and settlement agreements filed on January 20, 2012, April 30, 2012, and April 18, 2012.

2. The Commission adopts each of the provisions of the stipulation and settlement agreement filed on May 17, 2013, except for section II.B.2, pertaining to deferring decisions on issues related to (a) the date ETI uses to start accruing implementation costs, (b) whether rider CGSC will also recover interest on unrecovered costs, (c) whether any historical costs billed to the CGS project code that are currently in base rates should be removed from base rates, credited, and recovered through rider CGSC, and (d) who pays if there are no subscribers. Those issues are resolved as set forth in this order. Accordingly, the Commission adopts in part and rejects in part the May 17 settlement as set forth in this order.

3. The CGS rider, attached to the May 17 stipulation and settlement agreement, is approved as of the date of this order. ETI shall file a clean CGS rider tariff in this docket within 10 days of the date of this order.

4. In the event there are no subscribers to the CGS program, unrecovered implementation and administration costs accrued to the CGSC rider will be charged to the LIPS and LIPS-TOD customers, the customer class that the program was designed to benefit.

5.     ETI is not authorized to recover interest on the unrecovered balance of the CGSC rider charges.

6.     There shall be no offset to the CGSC rider for amounts included in rates in Docket No. 39896.

7.     The Commission declines to address at this time the amount to be recovered as implementation and administration costs because such amount is not known at this time.

8.     The date upon which ETI is authorized to begin accruing CGS program implementation and administration costs is the date that the CGS Rider is implemented.

9.     ETI shall not file an application for the CGSC rider earlier than six months after the CGS rider becomes effective. ETI shall file an application for the CGSC rider in accordance with the agreement approved by this order.

10.    All other motions, requests for entry of specific findings of fact and conclusions of law, and any other requests for general or specific relief, if not expressly granted, are denied.

**SIGNED AT AUSTIN, TEXAS the** 19th **day of July 2013**

**PUBLIC UTILITY COMMISSION OF TEXAS**

**DONNA L. NELSON, CHAIRMAN**

**KENNETH W. ANDERSON, JR., COMMISSIONER**

q:\cadm\orders\final\38000\38951fo.docx

# APPENDIX B

## INTERIM ORDER

| APPLICATION OF ENTERGY TEXAS, | § | PUBLIC UTILITY COMMISSION |
|---|---|---|
| INC. FOR APPROVAL OF | § | |
| COMPETITIVE GENERATION | § | OF TEXAS |
| SERVICE TARIFF (ISSUES SEVERED | § | |
| FROM DOCKET NO. 37744) | § | |

## INTERIM ORDER

### I.    Introduction

This interim order addresses the Commission's decision regarding three threshold issues surrounding Entergy Texas, Inc.'s (ETI's) proposed competitive generation service (CGS). The Commission makes its determination on these three threshold issues so the parties can move forward with the remaining issues that parties have characterized as being contingent on Commission decisions on the threshold issues: (1) what types of costs that will be considered unrecovered for purposes of PURA § 39.452(b); (2) what types of ETI customers will be eligible for participation in the CGS program; and (3) which ETI customers will be responsible for paying the unrecovered costs.

ETI, Commission Staff, Office of Public Utility Counsel, Texas Industrial Energy Consumers, State Agencies, Kroger Co., Cities,[1] Wal-Mart Stores Texas, LLC and Sam's East, Inc. participated in this docket.

### II.    Procedural History

ETI submitted its proposed CGS tariff and related riders in Docket No. 37744, its last rate case.[2] In that rate case, the parties settled on all issues except for ETI's CGS proposal. After a hearing on the CGS proposal and the associated riders, the administrative law judge (ALJ)

---

[1] The cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Pinehurst, Port Arthur, Port Neches, Rose City, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange.

[2] *Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs,* Docket No. 37744, Corrected Application (Feb. 23, 2010).

forwarded the parties' stipulation and settlement agreement and the proposal for decision to the Commission for consideration.

The Commission considered the settlement and the proposal for decision at the November 10 and December 1, 2010 open meetings. The Commission adopted the settlement for the rate case issues and severed the CGS issues into this docket, including the record in Docket No. 37744.[3]

At the December 1, 2010 open meeting, the Commission requested the parties to enter into negotiations and work to come to agreement on as many of the undetermined CGS program issues as possible, and then bring the issues for which an agreement could not be reached back to the Commission for consideration. Status reports were filed on January 13 and 28, February 18, March 11, and April 8, 2011. These reports indicated that parties continued to negotiate and that they were working to narrow the contested issues.

On September 8, 2011, State Agencies, Cities, OPUC, Kroger, and Wal-Mart jointly filed a motion requesting a decision on the proposal for decision in this docket. TIEC and Commission Staff filed responses to the joint motion and generally opposed the motion. At the September 29, 2011 open meeting, the Commissioners considered the motions and issued an order requiring the parties to file pleadings identifying the CGS tariff issues that have been settled on by the parties and identifying the issues for which a settlement could not be reached. The parties were also permitted to identify issues that are contingent upon the Commission's determination of the unsettled issues.

On November 1, 2011, several parties[4] filed an agreed list of settled issues. However, the parties did not agree on a recommendation as to how the unsettled issues and issues that are contingent on the Commission's determination of unsettled issues should be addressed and resolved by the Commission. Therefore, TIEC also separately filed a list of unsettled issues and request for procedural schedule. TIEC also requested that the Commission receive additional evidence in order to resolve the unrecovered costs issue because ETI's proposal in Docket No. 37744 was based on ETI's proposal for an energy-only program, not an energy and

---

[3] *Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs,* Docket No. 37744, Order No. 14 Memorializing Decision Granting Motion to Sever (Dec. 3, 2010).

[4] Cities, Entergy, OPUC, Commission Staff, State Agencies, and Wal-Mart/Sam's East. Kroger Company did not oppose the agreed settled issues and Cottonwood Energy has not participated in the discussions.

capacity-based program. TIEC reported that during the time period when the parties were negotiating the Entergy Operating Committee had agreed that CGS power from qualifying facilities in the ETI service territory could provide firm generation.[5]

At the December 8 and December 15, 2011 open meetings, the Commission decided that the parties should submit stipulated facts, the Commission would re-open the record to admit additional evidence, and then the Commission would make a decision on the unsettled issues. After that, the Commission planned to issue an interim order reflecting the decisions on the unsettled, threshold issues.

On January 20, 2012, the parties submitted agreed settlement terms and stipulated facts. The parties reached agreement in principle on a number of discrete items within the overall framework of the CGS program and tariffs. Many of the items are simply elements of larger program issues that retain one or more as yet unsettled aspects essential to final resolution of that program issue. Items as to which agreement in principle exists are "subject to satisfactory resolution of unsettled issues."[6]

On January 26, 2012, ETI submitted supplemental direct testimony. On February 10, 2012, the intervenors submitted supplemental direct testimony and on February 25, 2012, ETI and intervenors submitted rebuttal and cross rebuttal testimony. The parties submitted statements of position and pre-hearing briefs on March 26, 2012.

On April 13, 2012, the parties submitted an unopposed stipulation on the threshold issue regarding customers responsible for paying unrecovered costs. The parties, except ETI, agreed that CGS customers would be the only ETI customers responsible for unrecovered costs of the CGS program. ETI did not join or oppose this stipulation.[7] On April 18, 2012, the parties submitted a third stipulation on customer eligibility stating that LIPS customers would be the CGS-eligible customers, with certain limitations on the LIPS customers' participation and other program minimums and caps.[8]

[5] TIEC's Response to Joint Motion for Decision on Proposal for Decision at 4 (Sep. 15, 2011).

[6] CGS Stipulated Matters and Stipulated Facts (Jan. 20, 2012).

[7] Unopposed Stipulation on Unresolved Issue No. 3 (Apr. 13, 2012).

[8] Stipulation on Unresolved Issue No. 2 (Apr. 18, 2012).

The Commission held a hearing on the remaining contested threshold issue on April 19, 2012.

## III.    Discussion

PURA[9] § 39.452(b) requires ETI to propose a CGS tariff that would require ETI to purchase CGS, selected by the CGS customer, and provide the generation at retail to the customer.  ETI is required to provide and price retail transmission service, including necessary ancillary services, to retail customers who choose to take advantage of the competitive generation tariff at a rate that is unbundled from the utility's cost of service.  Competitive generation customers are not to be considered wholesale transmission customers.  The statute required the Commission to approve, reject, or modify the proposed tariff not later than September 1, 2010.  The CGS tariff may not be considered to offer a discounted rate or rates under Section 36.007, and ETI's rates shall be set, in the proceeding in which the tariff is adopted, to recover any costs unrecovered as a result of the implementation of the tariff.  The statute requires the Commission to ensure that a competitive generation tariff not be implemented in a manner that harms the sustainability or competitiveness of manufacturers that choose not to take advantage of competitive generation.  PURA § 39.452(b) also prohibits the Commission from issuing a decision relating to the competitive generation tariff that is contrary to an applicable decision, rule, or policy statement of a federal regulatory agency having jurisdiction.

The Commission finds that the three stipulation-and-settlement agreements are reasonable and adopts them to the extent they do not conflict with other Commission determinations in this docket.

Adoption of the three stipulation-and-settlement agreements leaves one threshold issue remaining:  the types of costs that will be considered ETI's unrecovered costs for purposes of PURA § 39.452(b).  The Commission finds that unrecovered costs are only those costs necessary to implement and administer the CGS program and are not to be defined to include lost revenues, embedded generation costs, or any other types of costs.

---

[9] Public Utility Regulatory Act (PURA), TEX. UTIL. CODE ANN. §§ 11.001-66.017 (Vernon 2007 & Supp. 2011).

## A. Eligible Customers Stipulation

The Commission adopts the stipulation and settlement regarding eligible customers and finds that LIPS customers are the ETI customers that will be eligible to participate in the CGS program (with further limitations as set forth in the parties' stipulation on this issue).[10]

## B. Customers Responsible for Paying Unrecovered Costs Stipulation

The Commission also adopts the stipulation and settlement regarding determining which customers will be responsible for paying the unrecovered costs referenced in PURA § 39.452(b). To the extent there are costs unrecovered as a result of implementation of the CGS program tariff, those costs will be borne solely by customers taking service under the CGS tariff.[11]

## C. January 20, 2012 CGS Stipulated Matters and Stipulated Facts

The Commission adopts the stipulated facts submitted by the parties on January 20, 2012 regarding ETI's capacity deficit and the program cap and notes that the items that are a part of the "agreed settlement terms" regarding eligible CGS suppliers, amount of CGS capacity, the CGS customer unbundled rate, the CGS energy payment, the CGS customer fixed-cost contribution, the CGS customer unserved energy rate, and the recognition of CGS supply as firm capacity are items for which there is only an agreement in principle that are subject to satisfactory resolution of unsettled issues.[12]

## D. Unrecovered Costs

The remaining threshold issue, the meaning of "costs unrecovered as a result of implementation of the CGS program tariff," as used in PURA § 39.452(b), was the subject of the April 19, 2012 hearing. In the proposal for decision, the ALJ found that ETI is entitled to collect unrecovered embedded generation costs and any other related base rate costs as a result of customer migration to the CGS program.[13]

---

[10] Stipulation on Unresolved Issue No. 2 (Apr. 18, 2012).

[11] Unopposed Stipulation on Unresolved Issue No. 3 (Apr. 13, 2012).

[12] CGS Stipulated Matters and Stipulated Facts at 1 (Jan. 20, 2012).

[13] Proposal for Decision at 22 (Oct. 5, 2010).

ETI argued that unrecovered costs should be defined as the embedded production costs and any other related base rate costs that would have been recovered through traditional rates charged to CGS customers that will no longer be recovered due to the CGS program.[14] TIEC took the position that unrecovered costs should not include ETI's hypothetical lost revenues and that the costs that could be unrecovered as a result of implementation of the tariff should include the expenditures actually incurred by ETI to implement and maintain the CGS program.[15] Cities and OPUC agreed with TIEC that unrecovered costs are not the same thing as unrecovered revenues.[16] Cities also noted that it would be unreasonable to allow ETI to continue to incur costs for a customer the utility no longer plans to serve.[17]

In making its determination of the definition of unrecovered costs, the Commission follows the precedent set in *CenterPoint Energy Houston Electric, LLC v. Pub. Util. Comm'n*, 354 S.W.3d 899 (Tex. App—Austin, 2011 no pet.) where the Third Court of Appeals found that because the language of PURA § 39.905 did not specifically provide for recovery of "lost revenues" and that in at least two other provisions of PURA[18] the legislature expressly distinguishes "costs" from "revenues," the term "costs," as used by the legislature in PURA § 39.905, is not intended to include lost revenues.[19] Like PURA § 39.905, PURA § 39.452(b) only provides for "costs unrecovered as a result of implementation of the tariff" and does not specifically provide for the utility to recover lost revenues or any other type of costs.

Based on the evidence and testimony, the Commission finds that the proper interpretation of "costs unrecovered as a result of implementation of the CGS program tariff" is costs to implement and administer the CGS program tariff. Such unrecovered costs do not include lost revenues, embedded generation costs, or any other types of costs. The Commission reverses the proposal for decision on this issue.

---

[14] Supplemental Direct Testimony, Exhibits, and Workpapers of Phillip R. May, ETI Ex. 91 at 6.

[15] Supplemental Direct Testimony of Jeffry Pollock, TIEC Ex. 15 at 14-15.

[16] Supplemental Direct Testimony of Karl Nalepa, Cities Ex. 6C at 7 and Supplemental Cross Rebuttal Testimony of Clarence Johnson, OPUC Ex. 8 at 6.

[17] Supplemental Direct Testimony of Karl Nalepa, Cities Ex. 6C at 7-8.

[18] PURA § 55.024(b) and PURA § 56.025(e).

[19] *CenterPoint Energy Houston Electric, LLC v. Pub. Util. Comm'n*, 354 S.W.3d 899, 903-904 (Tex.Civ.App—Austin, 2011)

The Commission issues this interim order so that the parties may work to reach an agreement on the components of the CGS program tariff that are contingent on the Commission's decision on the threshold issues.

## IV.     Conclusion

The Commission adopts each of the three stipulation-and-settlement agreements and finds that unrecovered costs for the CGS program are those needed to implement and administer the CGS program and are not lost revenues, embedded generation costs, or any other types of costs.

## V.     Findings of Fact

### *Procedural History*

1. As part of its application in Docket No. 37744, *Application of Entergy Texas, Inc. for Authority to Change Rates and Reconcile Fuel Costs*, ETI proposed a competitive generation service (CGS) program pursuant to Public Utility Regulatory Act. Tex. Util. Code Ann. (PURA) § 39.452(b).

2. On July 16, 2010 and July 20, 2010, a State Office of Administrative Hearings administrative law judge held a hearing on the merits on ETI's CGS proposal.

3. A proposal for decision was issued on November 1, 2010. The ALJ ultimately recommended that the CGS proposal be rejected.

4. The Commission considered the proposal for decision at the November 10 and December 1, 2010 open meetings as part of Docket No. 37744. At the December 1, 2010 open meeting, the Commission adopted the settlement for the rate case issues and severed the CGS proposal into this Docket. The Commission requested that the parties enter into negotiations and work to come to agreement on as many of the undetermined issues as possible, and then bring the issues for which an agreement could not be reached back to the Commission for consideration.

5. Order No. 1 was issued on December 3, 2010 severing the CGS issues into this docket, including the record in Docket No. 37744.

6.    Sabine Cogen, LP filed a motion to intervene in this docket on December 23, 2010. ETI filed an objection to Sabine Cogen, LP's motion to intervene on December 30, 2010. Sabine Cogen, LP's motion to intervene was denied in Order No. 3 on January 12, 2011.

7.    ETI, Commission Staff, Office of Public Utility Counsel, Texas Industrial Energy Consumers, State Agencies, Kroger Co., Cities,[20] Wal-Mart Stores Texas, LLC and Sam's East, Inc., and Cottonwood Energy are parties to this proceeding.

8.    On January 11, 2011, the Commission ALJ issued Order No. 2 requiring ETI to either provide an update on the status of settlement discussions or to propose a schedule, agreed to by all parties, for finalizing the outstanding issues.

9.    The parties filed status reports on January 13 and 28, February 18, March 11, and April 8, 2011. These reports indicated that parties continued to negotiate and that they thought that they could narrow the issues.

10.    On September 8, 2011, State Agencies, Cities, OPUC, Kroger, and Wal-Mart jointly filed a motion requesting a decision on the proposal for decision in this docket. TIEC and Commission Staff filed responses to the joint motion and generally opposed the motion. At the September 29, 2011 open meeting, the Commissioners considered the motions and issued an order requiring the parties to file pleadings identifying the CGS tariff issues that have been settled on by the parties and identifying the issues for which a settlement could not be reached. The parties were also permitted to identify issues that are contingent upon the Commission's determination of the unsettled issues.

11.    On November 1, several parties filed an agreed list of settled issues. TIEC also separately filed a list of unsettled issues and request for procedural schedule. TIEC also requested that the Commission receive additional evidence in order to resolve the unrecovered costs issues because ETI's proposal in Docket No. 37744 was based on ETI's proposal for an energy-only program, not an energy and capacity-based program. The circumstances had changed primarily due to the agreement of the Entergy Operating to treat CGS power from qualifying facilities in the ETI service territory as firm

---

[20] The cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Pinehurst, Port Arthur, Port Neches, Rose City, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange.

generation. The remainder of the parties filed a joint agreed list of unsettled issues and issues contingent on a Commission determination of unsettled issues.

12. At the December 8 and December 15, 2011 open meetings, the Commissioners decided that the parties should submit stipulated facts, the Commission would re-open the record to admit additional evidence as requested by TIEC, and then the Commission would make a decision on the three threshold unsettled issues in an interim order.

13. On December 18, 2011, Order No. 4 was issued establishing a procedural schedule.

14. On January 20, 2012, the parties submitted agreed settlement terms and stipulated facts. The parties reached agreement in principle on a number of discrete items within the overall framework of the CGS program and tariffs. Many of the items are simply elements of larger program issues that retain one or more as yet unsettled aspects essential to final resolution of that program issue. Items as to which agreement in principle exists are "subject to satisfactory resolution of unsettled issues."

15. On January 24, 2012, Order No. 5 was issued clarifying the number of copies of testimony that were to be filed by the parties.

16. On January 26, 2012, ETI submitted supplemental direct testimony. On February 10, 2012, the intervenors submitted supplemental direct testimony and on February 25, 2012, ETI and intervenors submitted rebuttal and cross rebuttal testimony. The parties submitted statements of position and pre-hearing briefs on March 26, 2012.

17. Order No. 6 was issued on February 1, 2012 setting April 19, 2012 as the date for the hearing.

18. On April 13, 2012, the parties filed an unopposed stipulation that to the extent there are costs unrecovered as a result of the implementation of a CGS tariff, those costs should be borne solely by customers taking service under the CGS tariff. ETI did not join but did not oppose the stipulation.

19. On April 18, 2012, the parties filed an unopposed stipulation regarding customer eligibility. LIPS customers will be eligible to participate in ETI's CGS program (with further limitations as set forth in the stipulation on this issue).

20. The Commission held the hearing on the merits on April 19, 2012.

### *Eligible customers stipulation*

21.     The parties agreed that only customers eligible to take service under ETI's Large Industrial Power Service (LIPS) are eligible customers for the CGS program.

22.     The parties agreed that only LIPS firm load will be eligible to participate in the CGS program.

23.     The parties agreed that LIPS customers with interruptible service (IS) or standby and maintenance service (SMS) load are not precluded from participating in the CGS program, but this participation is limited to their firm LIPS load. To the extent that customers with IS load participate in the CGS program, they must comply with the terms of the IS tariffs regarding minimum LIPS load. Only the portion of the customer's LIPS load that is in excess of the firm contract power minimum requirement under section 1 of Schedule IS is eligible for the CGS program.

24.     The parties agreed that to the extent there are increased administration costs associated with billing a customer that has CGS and IS or SMS load, the CGS customer will bear the costs.

25.     The parties agreed that there will be a 115 MW cap on the CGS program.

26.     The parties agreed that there will be a 5 MW minimum on CGS customer load.

27.     The parties agreed that there will be no aggregation of CGS customer load to meet the 5 MW minimum on CGS customer load.

28.     The parties agreed that there will be a cap of 10 CGS purchase agreements.

### *Customers responsible for paying unrecovered costs stipulation*

29.     The parties, except ETI, agreed that to the extent there are costs unrecovered as a result of the implementation of a CGS tariff, those costs should be borne solely by customers taking service under the CGS tariff, *i.e.*, CGS customers. ETI did not oppose this stipulation.

### *January 20, 2012 CGS Stipulated Matters and Stipulated Facts*

30.     In the CGS stipulated matters and stipulated facts filed on January 20, 2012, the parties stated they had reached an agreement in principle on a number of discrete items within

000000010

the overall framework of the CGS program and tariffs, which were listed in Section I. A-G of the stipulation. However, many of those items are simply elements of larger program issues that retain one or more as yet unsettled aspects essential to final resolution of that program issue. Items as to which agreement in principle exists, subject to satisfactory resolution of unsettled issues, include the following:

A.    Eligible CGS suppliers

1.    Eligible CGS suppliers will be limited to qualifying facilities that are or will be directly connected to ETI. Any expansion of eligible CGS suppliers would require initiation of new Commission proceedings.

B.    Amount of CGS capacity

1.    A CGS customer will specify the amount of its load to be served by a specified CGS supplier.

2.    The specified CGS supplier will enter into a contract with Entergy Services, Inc., on behalf of ETI, or directly with ETI, for the purpose of becoming an Entergy system network resource. The agreement between the CGS supplier and Entergy Services, Inc. or ETI shall include a contract for the purchase of capacity and energy (CGS purchase agreement). Per determination of the Entergy Operating Committee, the capacity and energy contracted for under the CGS purchase agreements shall be allocated solely to ETI.

3.    The level of capacity contracted for under the CGS purchase agreement (CGS contract capacity) will be the same level of capacity contracted for in a separate but related contract between the CGS supplier and the CGS customer.

4.    The monthly CGS supplied capacity shall be calculated monthly based on the on-peak energy deliveries of CGS-supplied energy from the CGS supplier. The monthly CGS supplied capacity shall be the lesser of the CGS contract capacity and the result of the following calculation—on a rolling 12-month basis (using a cumulative basis during the first 11 months), the sum of the CGS-supplied energy delivered by the CGS supplier during on-peak hours, divided by the number of on-peak hours during the same time period, divided by 0.8. On-peak hours are defined as the hours ending 7:00 am

through 10:00 pm Monday through Saturday, excluding North American Electric Reliability Corporation holidays.

C.     CGS-customer unbundled rate

1.     CGS customers are limited to, and will remain, ETI retail customers.

2.     ETI will not make a capacity payment to the CGS supplier, and the CGS customer will not pay ETI the embedded production cost in the firm rate schedule under which the customer would otherwise be eligible to receive service.

3.     The price for retail delivery service, including necessary ancillary services, to retail customers who choose to take advantage of the competitive generation tariff will be a rate that is unbundled from ETI's cost of service and that will be determined by a credit to the CGS customer's bill based on the unbundled production costs associated with the otherwise applicable firm rate.

4.     The unbundled, embedded production cost for a LIPS customer based on current rates is $6.84 per kW per month. The CGS credit is subject to review and modification in subsequent rate cases. If the clause "less any corresponding concurrent reduction in energy purchased by the CGS customer" referenced in section F.1 below is adopted, then certain parties may recommend a further adjustment to the LIPS embedded production cost specified in this paragraph C.4.

5.     With the exception of the capacity credit and fixed fuel factor, a CGS customer will pay ETI a retail rate that includes all other charges the customer would pay as a firm customer (for example Rider TTC, HRC, SRC, SRO, and IFF charges, if applicable).

D.     CGS energy payment

1.     CGS customers will pay fuel costs based on avoided cost for CGS-supplied energy. Specifically, ETI will purchase hourly CGS energy supplied by the CGS supplier from the CGS contract capacity at the system hourly avoided-energy-cost as determined under Rate Schedule LQF. ETI will charge the CGS customer at the same rate for that hourly CGS-supplied energy not to exceed the energy requirement of the CGS customer.

E.    CGS customer fixed-cost contribution

1.    The level of compensation to ETI from CGS customers for CGS service will include a monthly fixed charge called a fixed-cost contribution.

2.    The fixed-cost contribution will be $1.10 per kW of CGS load per month.

3.    Revenues from the fixed-cost contribution will reduce any otherwise unrecovered costs associated with the program.

F.    CGS customer unserved energy rate

1.    If, in any hour in a delivery month, there is hourly CGS unserved energy, the CGS customer will take service from ETI under the CGS unserved energy rate. Hourly CGS unserved energy is the difference in any given hour between the amount of energy corresponding to the full amount of CGS contract capacity and the amount of energy actually supplied to ETI from the CGS contract capacity by the CGS supplier in such hour, not to exceed the energy requirement of the CGS customer. The parties have not agreed whether the following clause should be added to this last sentence: "less any corresponding concurrent reduction in energy purchased by the CGS customer."

2.    The structure of the CGS unserved energy tariffed rate will include an agreed energy charge and agreed O&M adder.  The monthly CGS unserved energy charge will be the sum of (a) the hourly CGS unserved energy for the month times 105% of the system hourly avoided energy cost as determined under Rate Schedule LQF and (b) the hourly CGS unserved energy for the month times specified variable O&M charges specified immediately below in paragraph 3.

3.    The specified variable O&M charges for the CGS unserved energy rate are as follows:

| Delivery Voltage | On-Peak Per kWh | Off-Peak Per kWh |
|---|---|---|
| Distribution (less than 69kV) | $0.03555 | 0.00540 |
| Transmission (69kV and greater) | $0.02451 | 0.00222 |

000000013

4. On-peak and off-peak hours for the CGS unserved energy rate are as follows:

a. Summer: On-peak hours are 1:00 pm to 9:00 pm Monday through Friday of each week beginning on May 15 and continuing through October 15 of each year except that Memorial Day, Labor Day and Independence Day (July 4 or the nearest weekday if July 4 is on a weekend) are not on-peak.

b. Winter: On-peak hours for each week of Monday through Friday beginning October 16 and continuing through May 14 of each year are 6:00 am to 10:00 am and 6:00 pm to 10:00 pm, except that Thanksgiving Day, Christmas Day, and New Year's Day (or the nearest weekday if the holiday should fall on a weekend) are not on-peak.

c. Off-peak hours are all hours of the year not specified as on-peak hours. With the approval of the Commission, ETI may at its sole discretion change on-peak hours and season from time to time.

5. Revenues from the CGS unserved energy rate derived from the variable O&M charges will go towards offsetting any unrecovered costs as a result of the implementation of the CGS tariff.

6. Revenues from the CGS unserved energy rate derived from 105% of the system hourly avoided energy charges will go towards offsetting ETI's eligible fuel costs.

G. Recognition of CGS supply as firm capacity. Progress has been made on resolving issues regarding the recognition of CGS capacity as firm capacity, but final resolution of these issues, including the following, is contingent on the Entergy Operating Committee's approval as well as a final resolution of all issues.

1. The Entergy Operating Committee has established certain conditions that must be met before it will recognize a CGS purchase agreement as "capability" for the Entergy System, for purposes of determining reserve equalization payments or receipts. The parties are continuing to discuss the conditions established by the Operating Committee.

2.    The capacity product from CGS purchase agreements will be a 24/7 unit-contingent product.

3.    The delivery term of CGS purchase agreements may be from one year to five years, and must be a whole number of years.

4.    The contract capacity will be a fixed capacity amount throughout any successive 12-month period during the contract term.

5.    The parties have tentatively agreed to a number of concepts for firming up CGS capacity that would be reflected in a form contract for use in implementing the CGS program. The parties will continue to negotiate other concepts and terms for inclusion in a form supply contract.

31.    The parties stipulated that the Strategic Resource Plan (SRP) for the Entergy system (of which ETI is a part) projects a continuing need for additional capacity for ETI and the Entergy system through 2017. Entergy's and ETI's resource needs are subject to change at any time based on actual experience related to operational conditions, resource offers and solicitations, and other events that affect resource needs.

32.    The parties stipulated that based on an assessment of load requirements and generating capability, the SRP projects that ETI has an incremental net resource deficiency of 260 MW in 2012 and 504 MW in 2013.

33.    The parties stipulated that the Entergy system-wide planning process is conducted pursuant to the requirements of the Entergy system agreement and is designed to result in a portfolio of resources that differ by term and source. The Entergy system agreement states that the objective of this process is to ensure cost-effective, reliable levels of service.

34.    The parties stipulated that CGS purchase agreements are resources that will be included in the Entergy System's portfolio of supply resources, consistent with the terms and conditions related to the delivery requirements of those purchase agreements (*e.g.*, degree of dispatchability, term, degree of firmness).

35.    The parties stipulated that it is reasonable at the outset of the CGS program to establish a cap on the amount of load that may subscribe to CGS service.

36.    The parties stipulated that the range of the cap should be between 80 MW and 150 MW.

*Unrecovered costs*

37.    It is reasonable to adopt the three unopposed stipulation-and-settlement agreements regarding customer eligibility for the CGS program; the customers responsible for paying for unrecovered costs; the capacity deficit; and the program cap.

38.    PURA § 39.452(b) provides for the utility to be able to recover any costs unrecovered as a result of the implementation of the tariff.

39.    In *CenterPoint*, the Third Court of Appeals found that because the language of PURA § 39.905 did not specifically provide for recovery of "lost revenues" and that in at least two other provisions of PURA the legislature expressly distinguishes "costs" from "revenues," the term "costs," as used by the legislature in PURA § 39.905, is not intended to include lost revenues.   Like PURA § 39.905, PURA § 39.452(b) only provides for "costs unrecovered as a result of implementation of the tariff" and does not specifically provide for the utility to recover lost revenues or any other type of costs.

40.    The Commission finds that the costs that will be unrecovered as a result of the implementation of the CGS program tariff are the costs to implement and administer the CGS program tariff.


## VI.    Conclusions of Law

1.    The Commission has jurisdiction and authority over this proceeding pursuant to PURA §§ 14.001 and 39.452(b).

2.    PURA § 39.452(b) does not allow for the recovery of lost revenue or embedded generation costs.


## VII.    Ordering Paragraphs

1.    The Commission adopts each of the three stipulation-and-settlement agreements filed on January 20, 2012, April 30, 2012, and April 18, 2012.

2.    The parties shall work to reach an agreement on the issues that are considered contingent on the Commission's decision on the threshold issues.

3.　　All other motions, requests for entry of specific findings of fact and conclusions of law, and any other requests for general or specific relief, if not expressly granted, are denied.

SIGNED AT AUSTIN, TEXAS the _12th June_ day of ~~May~~ 2012

PUBLIC UTILITY COMMISSION OF TEXAS

DONNA L. NELSON, CHAIRMAN

KENNETH W. ANDERSON, JR., COMMISSIONER

ROLANDO PABLOS, COMMISSIONER

q:\cadm\orders\interim\38000\38951 interim order.docx

# APPENDIX C

ETI's MOTION FOR REHEARING

APPLICATION OF ENTERGY TEXAS, §
INC. FOR APPROVAL OF §
COMPETITIVE GENERATION §
SERVICE TARIFF (ISSUES SEVERED §
FROM DOCKET NO. 37744) §

PUBLIC UTILITY COMMISSION
OF TEXAS

## ENTERGY TEXAS INC.'S
## MOTION FOR REHEARING

TO THE HONORABLE PUBLIC UTILITY COMMISSION OF TEXAS:

Entergy Texas, Inc. ("ETI" or "the Company") files this motion for rehearing of the Commission's July 19, 2013 Final Order, addressing ETI's application for approval of its proposed competitive generation service ("CGS") program and associated tariffs.

The Commission's final order in many respects is based on adoption of stipulations among the parties on various CGS program and tariff elements. Not all issues in the case, however, were settled. ETI now seeks rehearing by the Commission regarding several important contested elements of the CGS program and tariffs addressed and resolved by the Commission's Final Order: 1) the proper scope and definition of "unrecovered costs"; 2) the point in time at which ETI may begin to recover CGS implementation costs; and 3) whether interest should accrue during the time period that ETI must delay recovery of CGS implementation and administration costs.

**Point of Error No. 1: The Commission erred in determining that "unrecovered costs," as contemplated by PURA § 39.452(b), include only the costs necessary to implement and administer the CGS program, and do not include "lost revenues, embedded generation costs, or any other types of costs." (Interim Order at 4, 5-7, FoF 39-40, CoL 2; Final Order at 6, 7-8, 11, FoF 20, 50-51, CoL 2).**

**Point of Error No. 2: The Commission erred in excluding from evidence ETI's proposed Competitive Generation Services Unrecovered Service Cost ("CGSUSC") Rider, and the associated portions of the Supplemental Direct Testimony of Company witness Dennis Roach (p. 22, ll. 1-11 and Exhibit DRR-SD-4), on the ground that they were contrary to the Commission's ruling on "unrecovered costs" and therefore irrelevant. (Order No. 11 Ruling on Cities' Motion to Strike at 1-2).**

Under the terms of PURA § 39.452(b), ETI is guaranteed the ability "to recover any costs unrecovered as a result of the implementation of the [CGS] tariff." The Commission's Final Order determined that "unrecovered costs" include "only those costs necessary to implement and administer the CGS program and are not to be defined to include lost revenues, embedded

1

212

generation costs, or any other types of costs."[1] The Company respectfully submits that this ruling is inconsistent with the plain terms and requirements of PURA § 39.452(b), which broadly encompass not only tariff implementation and administration costs, but also the embedded production costs that ETI will lose the ability to recover as a result of the CGS program and tariffs. For the same reason, the Company excepts to and requests rehearing of the Commission's ruling excluding ETI's proposed CGSUSC Rider tariff and related testimony from evidence, since that ruling follows from the Commission's reading of Section 39.452(b).[2]

As the SOAH judge correctly concluded, ETI's right to recover costs that arise due to the implementation of the CGS program and tariffs is not subject to limiting terms or categories.[3] The statute does not state that ETI shall recover only costs incurred "in implementing and administering the CGS tariff." Instead, the plain terms of the statute entitle ETI to recover "any" manner of costs that would otherwise be unrecovered "as a result of" the tariff's implementation. The Commission's limitation of "unrecovered costs" to a single specific category of costs (implementation and administration costs) is not consistent with the statute. ETI is entitled to an opportunity to show under the statute, and has shown by its evidence, that implementation of the CGS tariffs will cause it to incur production costs that it cannot recover absent Commission provision for recovery in this case.

The Commission's interpretation of "unrecovered costs" is also at odds with the framework for cost recovery established in PURA § 39.452(b). First, the statute makes clear that the CGS program may not operate like a discount rate under PURA § 36.007; that is, the effect of the CGS program must **not** be that ETI is prevented from recovering the full "allocable costs of serving customers...."[4] Since PURA § 39.452(b) says, in effect, that ETI cannot be precluded, due to the CGS program, from recovering the allocable costs of serving its customers,

---

[1] Final Order at 6-8, 11, FoF 20, 51, CoL 2. The Commission's Final Order incorporates its previous ruling on the scope and definition of unrecovered costs set out in its June 12, 2012 Interim Order.

[2] *See* Order No. 11 Ruling on Cities' Motion to Strike (Feb. 6, 2013).

[3] Proposal for Decision ("PFD") at 18 (ETI will experience unrecovered production costs as a result of the CGS program), 22 (ETI entitled to recover any unrecovered cost, including embedded production costs), 23 ("Opponents of Rider CGSUSC have failed to identify any caveats to this expansive language..." guaranteeing full cost recovery).

[4] PURA § 36.007 is the provision that the CGS program must **not** mimic. This provision **prevents** a utility from recovering in its base rates charged to all customers the "allocable costs of serving customers paying discounted rates under this section...."

2

it necessarily follows that "unrecovered costs" include those very same types of costs, and not merely implementation and administration costs.

In addition, the cost recovery framework of Section 39.452(b) includes a requirement that "unrecovered costs" be identified, and rates be "set, in the [same] proceeding in which the tariff is adopted," to recover those costs. Thus, the statute plainly contemplates that the level of "unrecovered costs" be determined based on the same test year production costs that are used to determine base rates in that same proceeding. This is the approach that ETI's evidence and testimony takes in this case; ETI's witnesses identify the portion of the test year costs that will no longer be paid by customers migrating to CGS service and utilize that amount as the measure of unrecovered costs.[5] The Commission's definition of unrecovered costs does not give effect to this key requirement of the statute.

The provisions of Section 39.452(b) evidence the legislature's intent to ensure that ETI not be required to subsidize the CGS program,[6] as recognized by Chairman Smitherman in his discussion of the CGS program.[7] Moreover, the provisions in Section 39.452(b) preventing the CGS tariff from being treated as a discount rate are clearly intended to avoid the result in past rate cases where the Company's shareholders were required to absorb any shortfall in cost recovery arising from the offering of discount rates to retail industrial customers.[8]

Contrary to this legislative intent, under the Commission's definition of "unrecovered costs," the evidence in this case shows that ETI will lose any opportunity or ability to recover a portion of the fixed production costs it incurs to serve its customers, because customers moving to the CGS program will cease paying their share of those costs and no other customers will pick up the shortfall in cost recovery. In these circumstances, the Commission's interpretation of the term "unrecovered costs" has two statutorily impermissible impacts: 1) it prevents ETI from recovering costs that are unrecovered as a result of the CGS program's implementation, or even

---

[5] *See, e.g.*, PFD at 22.

[6] PFD at 3 ("the CGS legislation makes clear ETI is not to bear any costs as a result of the implementation of the program.").

[7] Open Meeting (Nov. 10, 2010) Tr. at 179 ("it's clear you're not supposed to shoulder the burden of this [program]...."), 210 ("under no circumstances will you eat it [costs of program]....").

[8] *E.g., Application of Entergy Texas for Approval of Its Transition to Competition Plan, and for the Authority to Reconcile Fuel Costs, to Set Revised Fuel Factors, and to Recover a Surcharge for Under-Recovered Fuel Costs*, Docket No. 16705, Proposal for Decision at 399; Second Order on Rehearing at 37-38, FoF 247-252 (Sep. 4, 1998).

the opportunity to make a demonstration that it has experienced "unrecovered costs"; and 2) it puts ETI in the same position as it would be if it were charging a discounted rate to CGS customers (that is, ETI and its shareholder have to absorb the shortfall in recovery and thereby subsidize the CGS program).

The Commission supports its position regarding the definition and scope of "unrecovered costs" almost exclusively by reference to the Third Court of Appeals decision in *CenterPoint Energy Houston Electric, LLC v. Pub. Util. Comm'n*.[9] For numerous reasons, that case is not pertinent to this proceeding. First, ETI's proposed definition of unrecovered costs addresses not lost revenues, but instead recovery of test year fixed production costs that it would recover through base rates from the CGS customer, but for that customer's switch to CGS service. As the ALJ determined and the evidence clearly demonstrates, "the 'unrecovered costs' referenced in PURA § 39.452(b) and the 'lost revenue' that ETI has calculated as the measure of the unrecovered costs are one and the same in the ratesetting context."[10]

The expert witnesses in this case agreed with the ALJ on this point, and they also recognized that these fixed production costs could constitute a variety of "unrecovered costs" within the meaning of Section 39.452(b).[11] Tellingly, the rate reduction that CGS customers earn by switching from their former firm Large Industrial Power Service ("LIPS") rates is explicitly based on the level of ETI's fixed production costs that they are able to avoid paying by the switch.[12] The Commission, however, has not recognized any means by which ETI can seek

---

[9] 354 S.W.3d 899 (Tex. App.—Austin 2011, no pet.).

[10] PFD at 22.

[11] PFD at 22, citing Tr. at 261-262; PFD at 25, citing TIEC Ex. 1 at 51-52 and Ex. JP-16; *see also* Direct Testimony of Clarence Johnson, OPC Ex. 1 at 88, Tr. at 351; Tr. at 356; Direct Testimony of Jeffrey Pollock, TIEC Ex. 1 at 51.

[12] *See* Stipulation of Facts, Nos. C. 2-4; Final Order FoF 41.c. 2-4.

4

to recover those costs in its order. Instead, the Commission has categorically precluded their recovery.[13]

From this discussion, it should be evident the Third Court's ruling in *CenterPoint*—that "lost revenues" and "unrecovered costs" are distinct statutory terms—does not address or justify the Commission's determination that ETI will not experience and cannot recover any manner of unrecovered costs (save for implementation/administration costs). Finally, the *CenterPoint* decision is distinguishable from the case at hand because of the clear differences in the CGS-related statutory provisions and the energy efficiency-related provisions that were before the Third Court of Appeals. PURA § 39.905(b)(1) specifies that energy efficiency cost recovery is limited to "expenditures made;" *i.e.*, "out of pocket expenditures associated with [the utility's] implementation of energy-efficiency programs...."[14] This is a completely different context and standard from the cost recovery concept set out in PURA § 39.452(b). Under the CGS statute, the standard for recovery—"any costs unrecovered as a result of the implementation of the tariff"—must be read in context with the requirement that the program not have the impact of a discounted rate. Viewing these provisions as a whole demonstrates that PURA § 39.452(h) is intentionally aimed at recovery of otherwise forgone embedded production costs. Recovery of such costs is the focus of the Company's proposed definition and tariff provisions.

For all these reasons, ETI respectfully submits that the Commission's determination regarding the scope and definition of "unrecovered costs" (as well as its exclusion from evidence of ETI's proposed CGSUSC tariff and explanatory testimony) is contrary to PURA, affected by error of law, arbitrary and capricious, an abuse of discretion, and unsupported by substantial evidence. Furthermore, the Commission's action contradicts ETI's right, under PURA § 36.051 and the Texas and United States Constitutions,[15] to rates sufficient to provide a reasonable

---

[13] The Commission's decision to narrowly define "unrecovered costs" to include only implementation and administration costs has rendered immaterial claims by the other parties that matters such as capacity value, load growth, or reductions in the variability of QF put, should be considered as offsets or as means to recoup "unrecovered costs." To the extent any party attempts to defend the Commission's order on the basis of such offsets, they are not contemplated by PURA § 39.452(b), are speculative, hypothetical, and unquantifiable at this time, and do not eliminate the existence of unrecovered costs and the need for a proper, statutorily supported definition supporting their recovery. *E.g.*, Tr. at 251 (TIEC witness concedes offsets cannot be quantified); TIEC Initial Brief at 16 (alleged reduced operational costs associated with implementation of CGS program cannot be quantified). These alleged offsets do not provide a reasonable basis or substantial evidence for its rulings regarding the meaning of "unrecovered costs," nor remedy the flaws in statutory interpretation regarding PURA § 39.452(b).

[14] *CenterPoint*, 354 S.W.3d at 901, 904.

[15] *See* Tex. Const. Art. I, § 19; U.S. Const. Amend. V, XIV.

5

opportunity to earn a reasonable return over and above the recovery of its reasonable and necessary expenses.

**Point of Error No. 3: The Commission erred in determining that ETI may not recover CGS implementation costs prior to the date that Rider CGS is approved. (Final Order at 8-9, 11, FoF 57A, Ordering Paragraph 8).**

The Commission determined that ETI could only begin to recover CGS program implementation and administration costs (*i.e.*, the costs to be recovered under the future CGS Cost, or "CGSC" Rider), on the date of the tariff's approval and further implementation pursuant to that approval (that is, July 19, 2013). The effect of this ruling is to prevent ETI from recovering the lion's share of the CGS implementation costs it has incurred in the conduct of this proceeding and in its previous good faith efforts to reach agreement with the parties on a host of issues related to the design of the CGS program and tariffs.[16] These collaborative efforts among the parties led to stipulations as to the vast majority of the elements of the CGS tariff.

The Commission's decision in this instance is at odds with the plain meaning of the statutory requirement in PURA § 39.452(b) that ETI be allowed to recover "any costs unrecovered as a result of the implementation of the [CGS] tariff...." This provision contemplates recovery of all CGS tariff implementation costs, regardless of when they are incurred. Without incurring the costs of bringing the CGS program and tariffs to this point, ETI and the Commission could not implement the tariff. Moreover, excluding recovery of these costs is inconsistent with the legislative intent, described in Point of Error No. 1, that ETI not subsidize the implementation of the CGS program and tariffs. For these reasons, the Company respectfully submits that the Commission's determination regarding the timeframe for recovery of CGS implementation costs is contrary to the applicable statutory requirements, affected by error of law, arbitrary and capricious, an abuse of discretion, and unsupported by substantial evidence.

**Point of Error No. 4: The Commission erred in its determination not to authorize the recovery of interest on CGS implementation costs. (Final Order at 10-11, FoF 57C, Ordering Paragraph 5).**

The Commission determined that it "is not appropriate for ETI to recover interest on the unrecovered balance of the CGSC rider charges."[17] The Commission supported its

---

[16] There is a small amount of CGS-related expense (approximately $300,000) that forms part of the test year costs upon which ETI's current base rates were established.

[17] FoF 57C.

6

determination by comparison to its recent practice regarding the treatment of rate case expenses, "which are typically amortized over a three-year period without a return on the unamortized balance."[18] The Commission's practice regarding the amortization and recovery without interest of rate case expenses, however, has not, to ETI's knowledge, been the subject of judicial review and is not controlling in this case. Rate case expenses are not governed by PURA § 39.452(b), which assures, without exception, ETI's the ability to recover all otherwise unrecovered implementation costs associated with the CGS program.

The time value of money ETI must forgo while it waits to begin recovery of CGS program administration and implementation costs, via the yet to be established CGSC Rider, and which it will just as surely forgo between periods of adjustment to that rider, is an unrecovered cost to the same extent as are other CGS program implementation costs. In an analogous context, the Texas Supreme Court has ruled that when otherwise statutorily mandated recovery of costs by a utility is delayed, then recovery of interest to reflect the time value of money is likewise required.[19] For these reasons, the Commission's denial of the recovery of interest is contrary to the applicable statutory requirements, affected by error of law, arbitrary and capricious, an abuse of discretion, and unsupported by substantial evidence.

In conclusion, ETI respectfully requests that the Commission grant this motion for rehearing in all respects. ETI requests such other and further relief to which it may show itself justly entitled.

---

[18] Final Order at 10.

[19] *CenterPoint Energy, Inc. v. Pub. Util. Comm'n*, 143 S.W.3d 81 (Tex. 2004) (ruling that the Commission had erred in delaying the accrual of carrying costs on stranded costs until the amounts were determined, rather than starting carrying costs when the costs first arose).

Respectfully submitted,

Steven H. Neinast
Assistant General Counsel
ENTERGY SERVICES, INC.
919 Congress Avenue, Suite 840
Austin, Texas 78701
(512) 487-3957 telephone
(512) 487-3958 facsimile

John F. Williams
Jay Breedveld
DUGGINS WREN MANN & ROMERO, LLP
600 Congress Avenue, Suite 1900
P.O. Box 1149
Austin, Texas 78767-1149
(512) 744-9300 telephone
(512) 744-9399 facsimile

By: _____
John F. Williams
State Bar No. 21554100

ATTORNEYS FOR
ENTERGY TEXAS, INC.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was served by facsimile, hand-delivery, overnight delivery, or First Class U.S. Mail on all parties of record in this proceeding on August 8, 2013.

_____
John F. Williams

8

# APPENDIX D

Texas Utilities Code § 39.452(b)



**Effective: June 19, 2009**

Vernon's Texas Statutes and Codes Annotated Currentness
  Utilities Code (Refs & Annos)
    Title 2. Public Utility Regulatory Act
      Subtitle B. Electric Utilities (Refs & Annos)
        ▾ Chapter 39. Restructuring of Electric Utility Industry
          ▾ Subchapter J. Transition to Competition in Certain Non-Ercot Areas
            →→ **§ 39.452. Regulation of Utility and Transition to Competition**

(a) Until the date on which an electric utility subject to this subchapter is authorized by the commission to implement customer choice under Section 39.453, the rates of the electric utility shall be regulated under traditional cost-of-service regulation and the electric utility is subject to all applicable regulatory authority prescribed by this subtitle and Subtitle A, including Chapters 14, 32, 33, 36, and 37.

(b) An electric utility subject to this subchapter shall propose a competitive generation tariff to allow eligible customers the ability to contract for competitive generation. The commission shall approve, reject, or modify the proposed tariff not later than September 1, 2010. The tariffs subject to this subsection may not be considered to offer a discounted rate or rates under Section 36.007, and the utility's rates shall be set, in the proceeding in which the tariff is adopted, to recover any costs unrecovered as a result of the implementation of the tariff. The commission shall ensure that a competitive generation tariff shall not be implemented in a manner that harms the sustainability or competitiveness of manufacturers that choose not to take advantage of competitive generation. Pursuant to the competitive generation tariff, an electric utility subject to this subsection shall purchase competitive generation service, selected by the customer, and provide the generation at retail to the customer. An electric utility subject to this subsection shall provide and price retail transmission service, including necessary ancillary services, to retail customers who choose to take advantage of the competitive generation tariff at a rate that is unbundled from the utility's cost of service. Such customers shall not be considered wholesale transmission customers. Notwithstanding any other provision of this chapter, the commission may not issue a decision relating to a competitive generation tariff that is contrary to an applicable decision, rule, or policy statement of a federal regulatory agency having jurisdiction.

(c) That portion of any commission order issued before the effective date of this section requiring the electric utility to comply with a provision of this chapter is void.

(d) Until the date on which an electric utility subject to this subchapter implements customer choice:

  (1) the provisions of this chapter do not apply to that electric utility, other than this subchapter, Sections

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

39.904 and 39.905, the provisions relating to the duty to obtain a permit from the Texas Commission on Environmental Quality for an electric generating facility and to reduce emissions from an electric generating facility, and the provisions of Subchapter G that pertain to the recovery and securitization of hurricane reconstruction costs authorized by Sections 39.458-39.463; and

(2) the electric utility is not subject to a rate freeze and, subject to the limitation provided by Subsection (b), may file for rate changes under Chapter 36 and for approval of one or more of the rate rider mechanisms authorized by Sections 39.454 and 39.455.

(e) An electric utility subject to this subchapter may proceed with and complete jurisdictional separation to establish two vertically integrated utilities, one of which is solely subject to the retail jurisdiction of the commission and one of which is solely subject to the retail jurisdiction of the Louisiana Public Service Commission.

(f) Not later than January 1, 2006, an electric utility subject to this subchapter shall file a plan with the commission for identifying the applicable power region or power regions, enumerating the steps to achieve the certification of a power region in accordance with Section 39.453, and specifying the schedule for achieving the certification of a power region. The utility may amend the plan as appropriate. The commission may, on its own motion or the motion of any affected person, initiate a proceeding to certify a qualified power region under Section 39.152 when the conditions supporting such a proceeding exist.

(g) Not later than the earlier of January 1, 2007, or the 90th day after the date the applicable power region is certified in accordance with Section 39.453, the electric utility shall file a transition to competition plan. The transition to competition plan must:

(1) identify how the electric utility intends to mitigate market power and to achieve full customer choice, including specific alternatives for constructing additional transmission facilities, auctioning rights to generation capacity, divesting generation capacity, or any other measure that is consistent with the public interest;

(2) include a provision to reinstate a customer choice pilot project and to establish a price to beat for residential customers and commercial customers having a peak load of 1,000 kilowatts or less; and

(3) include any other additional information or provisions that the commission may require.

(h) The commission shall approve, modify, or reject a plan filed under Subsection (g) not later than the 180th day after the date the plan is filed unless a hearing is requested by any party to the proceeding. A modification to the plan by the commission may not be in conflict with the jurisdiction or orders of the Federal Energy Regulatory Commission or result in significant additional cost without allowing for timely recovery for that cost. If a hearing is requested, the 180-day deadline is extended one day for each day of the hearing. The transition to competition plan shall be updated or amended annually, subject to commission approval, until the initiation of customer choice by an electric utility subject to this subchapter. Consistent with its jurisdiction, the commission shall have the authority in approving or modifying the transition to competition plan to require the electric utility

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

to take reasonable steps to facilitate the development of a wholesale generation market within the boundaries of the electric utility's service territory.

(i) Notwithstanding any other provision of this chapter, if the commission has not approved the transition to competition plan under this section before January 1, 2009, an electric utility subject to this subchapter shall cease all activities relating to the transition to competition under this section. The commission may, on its own motion or the motion of any affected person, initiate a proceeding under Section 39.152 to certify a power region to which the utility belongs as a qualified power region when the conditions supporting such a proceeding exist. The commission may not approve a plan under Subsection (g) until the expiration of four years from the time that the commission certifies a power region under Subsection (f). If after the expiration of four years from the time the commission certifies a power region under Subsection (f), and after notice and a hearing, the commission determines consistent with the study required by Section 5, S.B. No. 1492, Acts of the 81st Legislature, Regular Session, 2009, that the electric utility cannot comply with Section 38.073, it shall consider approving a plan under Subsection (g).

(j) Notwithstanding any other provision of this subtitle, in awarding a certificate of convenience and necessity or allowing cost recovery for purchased power by an electric utility subject to this section, the commission shall ensure in its determination that the provisions of Sections 37.056(c)(4)(D) and (E) are met and that the generating facility or the purchased power agreement satisfies the identified reliability needs of the utility.

CREDIT(S)

Added by Acts 2005, 79th Leg., ch. 1072, § 1, eff. June 18, 2005. Amended by Acts 2006, 79th Leg., 3rd C.S., ch. 11, § 1, eff. May 26, 2006; Acts 2009, 81st Leg., ch. 1226, § 3, eff. June 19, 2009.

HISTORICAL AND STATUTORY NOTES

2007 Main Volume

Acts 2006, 79th Leg., 3rd C.S., ch. 11, in subsec. (a), inserted "and except for proceedings and cost recovery mechanism authorized by Sections 39.458-39.463,", and in subd. (d)(1), inserted ", and the provisions of Subchapter G that pertain to the recovery and securitization of hurricane reconstruction costs authorized by Sections 39.458-39.463", and made a nonsubstantive change.

2014 Electronic Update

2009 Legislation

Acts 2009, 81st Leg., ch. 1226 in subsec. (b), substituted "An electric utility subject to this subchapter'' for "Notwithstanding Subsection (a), except for adjustments authorized by Sections 36.203, 39.454, 39.455, and 39.456, and except for proceedings and cost recovery mechanisms authorized by Sections 39.458-39.463, a person may not file a proceeding to change, alter, or revoke any rate offered or charged by an electric utility subject to this subchapter before June 30, 2008. As part of a Subchapter C, Chapter 36, rate proceeding, the utility'', in-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

serted "not later than September 1, 2010'', and added the fourth to eighth sentences; and added subsecs. (i) and (j).

V. T. C. A., Utilities Code § 39.452, TX UTIL § 39.452

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# APPENDIX E

District Court's Final Judgment

Filed in The District Court
of Travis County, Texas

OCT 16 2014 MC

At_____3:13____P M.
Amalia Rodriguez-Mendoza, Clerk



NO. D-1-GN-13-003434

| | | |
|---|---|---|
| ENTERGY TEXAS, INC., | § | IN THE DISTRICT COURT OF |
| PLAINTIFF, | § | |
| | § | |
| V. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| PUBLIC UTILITY COMMISSION | § | |
| OF TEXAS, | § | |
| DEFENDANT. | § | 345TH JUDICIAL DISTRICT |

## Final Judgment

On August 5, 2014, the Court heard this administrative appeal on the merits. Plaintiff Entergy Texas, Inc., defendant Public Utility Commission of Texas, intervenor Office of Public Utility Counsel, and intervenor Texas Industrial Energy Consumers appeared through counsel and announced ready. The Court, having reviewed the pleadings, the administrative record, the briefs, and argument of counsel, finds that the Public Utility Commission's final order in its Docket 38951, the agency order under review in this cause, should be in all things affirmed.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Final Order of the Public Utility Commission of Texas in its Docket No. 38951 is AFFIRMED.

1

IT IS FURTHER ORDERED that Plaintiff take nothing by its cause of action and that costs are assessed against the Plaintiff.

This is a final judgment that disposes of all parties and all claims and is appealable. All relief not expressly granted herein is DENIED.

Signed this 16th day of October, 2014

_____
Amy Clark Meachum
Judge Presiding

Approved as to form:

/s/ Megan M. Neal
Megan M. Neal
Assistant Attorney General
State Bar No. 24043797
Representing Defendant Public Utility Commission of Texas

_____
Marnie A. McCormick
Duggins Wren Mann & Romero, LLP
State Bar No. 00794264
Representing Plaintiff Entergy Texas, Inc.

/s/ Sara J. Ferris
Sara J. Ferris
Senior Assistant Public Counsel
Office of Public Utility Counsel
State Bar No. 50511915
Representing Intervenor Office of Public Utility Counsel

2

IT IS FURTHER ORDERED that Plaintiff take nothing by its cause of action and that costs are assessed against the Plaintiff.

This is a final judgment that disposes of all parties and all claims and is appealable. All relief not expressly granted herein is DENIED.

Signed this ____ day of October, 2014

_____
Amy Clark Meachum
Judge Presiding

Approved as to form:

_____
Megan M. Neal
Assistant Attorney General
State Bar No. 24043797
Representing Defendant Public Utility Commission of Texas

Marnie A. McCormick
Duggins Wren Mann & Romero, LLP
State Bar No. 00794264
Representing Plaintiff Entergy Texas, Inc.

_____
Sara J. Ferris
Senior Assistant Public Counsel
Office of Public Utility Counsel
State Bar No. _____
Representing Intervenor Office of Public Utility Counsel

2

<u>/s/ Rex Van Middlesworth</u>
Rex VanMiddlesworth
Thompson & Knight, LLP
State Bar No. 20449400
Representing Intervenor Texas Industrial Energy Consumers

3